(No. 11396.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EARNEST WALLACE, Plaintiff in Error.

*Opinion filed June 21, 1917.*

1. CRIMINAL LAW—*a court of review must determine whether there is a reasonable doubt as to defendant's guilt.* While a verdict in a criminal case will not be set aside on the facts unless there is clearly a reasonable doubt of the defendant's guilt it is still the duty of a court of review to determine such question, and a conviction upon evidence which fails to remove every reasonable doubt of guilt will not be sustained.

2. SAME—*instructions as to reasonable doubt should be concise.* The object of instructing the jury is to give them a concise statement of the principles of law which they should apply to the case, and the giving of instructions on the subject of reasonable doubt which are so exhaustive as to induce the jury to believe the court feared the jury might think there was a reasonable doubt of guilt when there was none, is erroneous.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. GEORGE F. BARRETT, Judge, presiding.

O. J. C. WRAY, FREDERICK B. SILSBEE, and IRVING E. READ, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and NOAH C. BAINUM, (JAMES C. O'BRIEN, and GEO. C. BLISS, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

This writ of error was allowed to review the judgment of the criminal court of Cook county by which the plaintiff in error was convicted of murder and sentenced to death. The plaintiff in error, Earnest Wallace, was indicted jointly with Edgar Butler for the murder of Jacob Levin, but the indictment was *nollied* as to Butler and no circumstance appears in the evidence connecting him even remotely with the crime.

On Saturday night, June 17, 1916, at about eleven o'clock, the persons in the saloon of Jacob Levin, at Twenty-seventh and Federal streets, in the city of Chicago, were startled by the exclamation, "Every son-of-a-bitch!" accompanied by the command, "Hands up!" and the appearance of a man with a drawn revolver. Instantly there was a rush for the front door. Some dropped to the floor, going out on their hands and knees, others jumped over these, and great confusion prevailed for a brief time, during which three shots were fired in the saloon, as a result of which Jacob Levin, the proprietor, who was behind the bar, was killed by a shot through the lung and heart, and a negro, William Monroe, who was standing in front of the bar, received a wound in the abdomen from which he died. No one was able to give any lucid account of the occurrences immediately after the appearance of the murderer, for all were engaged in endeavoring to make good their escape.

There were several persons in the saloon, one of whom was a white man, who stood nearest the front door and escaped first and has not since been heard from. The others, except the proprietor of the saloon, were negroes, who testified on the trial of the plaintiff in error, who is also a negro. The trial began on July 25, 1916, and the verdict was rendered on July 27, 1916, but a motion for a new trial was pending until February 21, 1917, when it was denied and the defendant was sentenced to be hanged on April 13, 1917.

The question in the case is the identity of the plaintiff in error as the murderer, and the evidence connecting him with the murder was given by John Porter, Henry Flynn and Martha Clark, who were also negroes. Porter testified that he was standing at the bar, about in the middle, opposite the cash register, where he had been for twenty minutes, drinking a glass of beer, when a man ran in with a revolver in his hand, which he pointed at the bar-tender with the remark which has been mentioned. Levin was standing opposite the witness, on the other side of the bar. There was no one between Porter and the front door, but three or four men were standing at the bar further from the front door than he was, and the man with the revolver passed them. Porter saw the flash of the revolver and heard the shot. He dropped down, crawling toward the door, and fell over somebody at the door. On the trial he pointed out the plaintiff in error as the man he saw fire the revolver in the saloon. Porter had never seen the defendant before, he knew nobody else who was in the saloon, and on the trial he failed to recognize any of the witnesses as persons who were in the saloon at the time of the shooting. He testified that for three weeks before that day he had been working at a fertilizer factory in Hammond; that he was paid off that day at noon and came to Chicago in the afternoon. He had previously been living at 2941 Dearborn street a short time and he went there to get his

clothes. He testified that the murderer wore no mask and
that there were five or six men in the saloon, but that he
had not recognized any of them since and would not be
able to do so. In going out he said that his hat fell off,
and he did not go very far but came back to the saloon
and picked it up right at the door where it fell and stood
around there a few minutes. Later, in the company of two
other men who the evidence shows were policemen who
had him in custody, he saw the defendant on State street,
on the opposite side of the street and a half block away,
and pointed him out to the policemen. The policemen ar-
rested the defendant. Porter's memory of events occurring
after he left the saloon is so uncertain and obscure, and his
testimony as to what he did, where he went and who was
with him is so indistinct and confused, that no intelligible
account of his actions or whereabouts can be derived from
his statements.

Martha Clark testified that about eleven o'clock she was
standing at the side door of Levin's saloon with a friend
of her husband, whose name she did not know and whom
she has not since seen, when the plaintiff in error, who
was standing there, asked her, "What the hell do you want
here?" She replied, "What the hell do you think I want
here? Nothing but a drink," and he told her, "You can't
get a drink here; beat it across the street." She went
across Federal street to Shimberg's saloon, which was on
the opposite corner, and had a drink with her husband's
friend there, and when she came out she saw the defend-
ant coming along the side of Shimberg's saloon toward Le-
vin's saloon. She went to her house, which was across the
street from Levin's saloon and three or four doors away,
and soon afterward heard the shooting, but she had just
gone to bed and did not know of the murder until the next
morning. She said she knew Wallace by sight but had
never spoken to him before this night, though she had met
him many times on the street.

Henry Flynn was a porter in the saloon of Lewis Shimberg, on the east side of Federal street, directly opposite Levin's saloon. He was standing in front of the saloon after eleven o'clock, alone, when he heard a pistol shot fired in Levin's saloon and in a few seconds two more shots. There was a rush to the door,—three or four men trying to get out at the same time and falling over one another, struggling to their feet and running in different directions. He testified that after the shooting was over Cooper Sharp came out of the Shimberg saloon, and a man came out of Levin's saloon and came across the street who claimed that he had been shot and stopped and spoke to Cooper Sharp. This man was Monroe, though Flynn did not know him. Flynn and Sharp examined Monroe and found that he was shot, and while they were all there the plaintiff in error came out of Levin's saloon, came across the street to the corner where the wounded man, Sharp and Flynn were standing, and ran east on Twenty-seventh street towards Dearborn street, making a motion as if he were putting something in his right pocket. Flynn pulled Monroe's shirt up to see if he was shot and put his hand on his side, and it was covered with blood.

Jacob Levin's saloon was at the southwest corner of Twenty-seventh and Federal streets, on the first floor of a two-story, brick front, frame building, fronting east on Federal street and having a diagonal corner entrance. The bar ran along the south side of the room. At the front end was a desk and next to it a cigar case, between which and the bar was a partition extending partly in front of the bar. The cash register stood against the south wall, back of the bar, at about its center. Just beyond the end of the bar was a passageway leading to a door in the north wall, which was the side entrance to the saloon. At the intersection of the curbs of Twenty-seventh street and Federal street in front of the saloon was an electric light hanging on an iron pole. On the east side of Federal street,

at the corner of Twenty-seventh street and directly opposite Levin's saloon, was Shimberg's saloon. It also had a corner entrance. The cash register contained $30 or $35 when the bar-tender left at seven o'clock. A few minutes after the murder it was found with the drawers open. It contained $7.86 in change and a dollar bill was on the floor.

There were in the saloon at the time of the shooting, and for a few minutes before, besides Levin, who was alone behind the bar, and the white man, who was standing at the east end of the bar, near the partition separating it from the cigar case, four colored men who were drinking beer. Monroe, who was one of the victims of the shooting, stood at the west end of the bar, and next east of him was Ed Green, then Dan Lockwood and then William Crawford. These men, except Monroe, who was killed, all testified to the sudden appearance of the man at the west end of the bar, his command of "Hands up!" and the precipitate expedition with which all sought to escape. None of them observed the effect of the shots or what became of the intruder. Lockwood and Green returned to the saloon in a few minutes. A crowd had gathered there and Levin lay in a corner, dead. Crawford, Lockwood and Green all testified that the man who did the shooting wore a black covering over his face and that it was impossible to identify him or tell whether he was white or black. None of them knew the defendant or had ever seen him until the day after the murder, when they saw him at the police station, and none of them recalled seeing the witness Porter in the saloon.

A few minutes previous to the occurrence, William Paddon and Edward Johnson, two other colored men, had been in the saloon, but Paddon had gone out about ten minutes before the shooting and was standing on the corner next to the electric light pole. Johnson came out a few minutes later, and the two were standing under the light, talking, when their attention was attracted by a scuffle in the

saloon and they saw the men tumbling on the floor and crawling out on their hands and knees. They then heard the shots fired. Neither of them knew Porter. They did not see him in the saloon that night and he was not there when they went out. When the shooting began Paddon went across the street to the northeast corner of Twenty-seventh and Federal streets and saw Monroe come out, walk across the street and speak to Cooper Sharp. Paddon remained there until the police came with the ambulance to take Monroe away, but he saw no one run east on Twenty-seventh street. Cooper Sharp contradicts Flynn, and says that the defendant did not pass them in front of Shimberg's. Crawford also, after he came out of the saloon, crossed Twenty-seventh street and came to where Paddon was at the northeast corner of Twenty-seventh and Federal streets. He saw Monroe come out of Levin's saloon, walk east across Federal street and stop and talk with Cooper Sharp and Flynn, but did not see the plaintiff in error come out of Levin's saloon or go east on Twenty-seventh street. It is improbable that the murderer would have followed the men who had witnessed the commission of his crime, out under the full blaze of an electric light. All the witnesses agree that he came from the back part of the saloon, and the more convenient as well as the safer way for him to depart was through the side entrance on Twenty-seventh street, through which he probably entered, which was only a few feet from the alley and railroad tracks back of the saloon. Neither does it seem reasonable that a person about to commit such a crime would walk up and down under a brilliant electric light courting recognition and wantonly seeking trouble with strangers.

The plaintiff in error denied ever having seen Martha Clark before she appeared as a witness against him at the trial. He denied being in Levin's saloon or on Twenty-seventh street on the night of the murder or nearer to the corner of Twenty-seventh and Federal streets than Thirty-

first street. He stated that he had no gun with him on that night and denied all connection with the crime. He stated that he spent the afternoon and evening of June 17, 1916, at Butler's pool room, 3128 State street, having his supper there about five o'clock. Afterward he spent the evening playing craps until eleven o'clock or half-past eleven. During the evening he went out once and got some cantaloupes and brought them in and they were eaten. After the game broke up, about eleven o'clock, he went to the corner of Thirty-first and State streets and got some sandwiches, which he brought back to the pool room. He then stayed there until a quarter past one, when he started home and was arrested. Three other players in the game corroborated him as to the time, place and manner of spending the evening.

All of the five witnesses who were in the saloon at the time of or just before the shooting were men who lived in the immediate vicinity,—some of them for many years,—were friends or acquaintances of the murdered man and were strangers to the plaintiff in error. No reason appears for any bias on their part in his favor, and if any existed there was opportunity for the State to discover and disclose it. Porter was an entire stranger, whose identification of the plaintiff in error was impossible unless the testimony of the three witnesses that he was masked is to be rejected as untrue. Their opportunity to observe and know was equal to his, their story is as reasonable, and they have by reason of their acquaintance with the deceased a stronger motive for wanting justice visited upon the assassin. Porter testified that the man with the revolver came past the men who stood at Porter's right,—that is, he came from the back part of the saloon,—and, standing between Porter and the other men, covered Levin with his revolver and gave his command of "Hands up!" thus placing himself in a position where it was impossible for him to see the whole interior of the saloon or all the men in it. Further, he

says that the men at the stranger's right began crawling out and jumping over one another to get out at the front door, to do which they were obliged to pass directly by him, while the safer, more convenient and more expeditious exit was by the side entrance, near which they were standing. According to the version of the three survivors of those who were standing at the bar the man with the revolver stood at the end of the bar, which gave him command of the room and of every person in it, and the natural exit for them under such circumstances was through the front door and not past the revolver to the back door. Recognizing the rule that the question of the credibility of witnesses is within the peculiar province of the jury and that a verdict in a criminal case will not be set aside unless there is clearly a reasonable doubt of the defendant's guilt, it is still the duty of a court of review to determine this question, and we do not regard the evidence in this record as sufficient to remove all reasonable doubt and create an abiding conviction that the defendant is guilty. Reprobation of the crime will not justify conviction of the accused upon evidence which fails to remove every reasonable doubt of his guilt.

We have more than once held that the giving of numerous instructions containing all the language restrictive of the application of the doctrine of reasonable doubt which it has been held in various cases not erroneous to give is improper, yet in this case again two pages of the abstract are filled with five instructions warning the jury against being misled by undue sensibility into regarding as reasonable, doubts which were only chimerical or conjectural, and against going outside the evidence to hunt up doubts created by resorting to trivial and fanciful suppositions and remote conjectures. The object of instructing the jury is to give them a concise statement of the principles of law which they should apply to the case and not an exhaustive treatise on those principles in detail. Two pages of discussion of

the doctrine of reasonable doubt are not illuminating but the reverse. Two lines are better. The effect upon the jury of the instructions brought together in this record upon the question of reasonable doubt could have been only to induce them to believe that in the mind of the court there was grave fear that the jury would think there was a reasonable doubt of defendant's guilt when there was none.

Other errors of minor importance have been argued but need not be considered.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*