(No. 14116.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. CHESTER TODD, Plaintiff in Error.

*Opinion filed December 22, 1921—Rehearing denied Feb. 9, 1922.*

1. CRIMINAL LAW—*the jury are judges of the credibility of witnesses.* The jury are not warranted in disregarding testimony from mere caprice, and the fact that the witnesses in support of a defense of alibi are related to the defendant will not, alone, justify disregarding their testimony, but the jury are the judges of the credibility of the witnesses and of the weight that should be given their testimony.

2. SAME—*when instruction as to alibi does not prejudice the defendant.* The theory of an alibi is that the defendant was so far from the scene of the crime as to make it impossible for him to have committed it, and an instruction which makes proof of such a state of facts essential to authorize an acquittal does not place too great a burden on the defendant, where the jury are further instructed that it is not necessary to prove the defense of alibi beyond a reasonable doubt, and that it is sufficient to entitle the defendant to an acquittal if from the evidence they have a reasonable doubt whether he was present at the time and place of the commission of the crime.

3. SAME—*great latitude is permitted in cross-examination as to prejudice of witness.* Cross-examination should generally be confined to what was brought out on direct examination, and while it is permissible in a proper case, on cross-examination, to ask an interested or hostile witness concerning acts or declarations showing bias and prejudice for the purpose of affecting the credibility of the witness, such matters rest largely in the discretion of the trial judge in controlling the cross-examination.

WRIT OF ERROR to the Circuit Court of Hancock county; the Hon. HARRY M. WAGGONER, Judge, presiding.

SCOFIELD, CALIFF & BELL, and HARTZELL, CAVANAGH, MARTIN & HARTZELL, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, LEE SIEBENBORN, State's Attorney, and EDWARD C. FITCH, (SAMUEL NAYLOR, and CLIFFORD WARNER, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Chester Todd was indicted by the grand jury of Hancock county on a charge of stealing a Buick coupe automobile, the property of Sherman Bradfield, on the 15th of August, 1920. He pleaded not guilty, was tried, convicted, sentenced to imprisonment in the penitentiary, and has sued out this writ of error.

Three errors discussed in defendant's brief as grounds why the judgment should be reversed are, (1) that the evidence was insufficient to sustain the verdict; (2) that the court erred in improperly restricting the cross-examination of the People's witness Bradfield; (3) that the court erred in giving two instructions for the People.

A Buick coupe automobile, 1919 model, belonging to Bradfield, was stolen from his garage or shed about one o'clock in the morning of August 15, 1920. Bradfield lived on a farm about five miles from LaHarpe, in Hancock county. A fair and races were being held in LaHarpe that week. Bradfield attended the fair the day of August 14 and drove home that evening in his Buick coupe, arriving home about a half hour before sunset. That same evening his daughter and a companion drove the same car back to LaHarpe to attend a party. They returned to the Bradfield home about 12:30 at night. When they drove the car into the garage they heard a noise like someone was in the building. After listening a little while and hearing nothing further they went into the house. Bradfield heard them come in and a little later heard the noise of a car starting. He jumped out of bed, went to the window, and saw his car, the lights on, being rapidly run out of his garage. He ran down-stairs and out of the house to shut the outer gate, but the car passed through it before he could do so. His daughter came out and they tried to start a sedan car that was in the shed but could not do so. They then went to a scale-house some distance away, where Bradfield's son-in-law kept a Ford, but could not start it. He then went to

his son-in-law's house, which was about half a mile from his own, and soon after his arrival there his daughter came with the Ford car. Bradfield and his son-in-law, in the Ford car, followed the tracks of the Buick coupe. He could identify the tracks because the car had Goodyear tires except one rear tire was a Goodrich, and they were of a different character. They followed the tracks to LaHarpe but could not follow them in the town. They examined different roads going out of LaHarpe and found the tracks in a road leading north toward Monmouth. Bradfield went to a butcher shop and telephoned the police at Monmouth and then returned home. On arriving there he examined his sedan car and found the distributor had been taken out, the timer pulled apart and the throttle taken off. He recovered the stolen car in Davenport, Iowa, about the first of September, 1920. Before that time defendant had been arrested and placed in jail in Carthage.

William Hunter and Bradfield called at the jail, before the car was found, to see defendant and had a talk with him. Bradfield testified defendant said he and George R. Aldrich stole the car; that he stood outside and watched the house while Aldrich got the car. He told Bradfield he would find it in Davenport, Iowa; that he could go there and get it but defendant could not tell where it was in Davenport. Bradfield got his car at the police station in Davenport. He testified when he had his talk with defendant in the jail, Hunter, sheriff Bennett, and his deputy, Sample, were present and heard part of the conversation.

Hunter testified he lived in Burgess, which is sixty or seventy miles from LaHarpe. The night of August 14 he sat up all night with a family where there had been a death and about daylight went to his home to do his chores. While he was doing them a tall, nice-looking man called him and asked if he knew where he could get some gasoline, and said the garages were all closed. Witness told the man he would get some gasoline as soon as he finished his chores.

The man waited five or ten minutes till he had finished and they then went around in front of the house, where a Buick coupe car was standing. Both got in the car and drove to witness' store to get the gasoline. Witness asked the man where he was from. He said he was from Springfield and was driving to Chicago. Witness told him he had gone out of his way pretty far, and the man said he had got lost. Witness began giving him directions how to go to Chicago, and the man said he had a friend in Davenport (which is about thirty-five miles from Burgess) and thought he would drive there and spend the day. He drove witness back to his residence and then drove on out of Burgess. The witness testified he saw the same man about two weeks later in the county jail at Carthage, and that defendant was the man who called on him for the gasoline in the early morning of August 15. Bradfield, the sheriff, and his deputy, were at the jail at the time. Witness said to defendant, "Hello, pal! Do you know me?" Defendant replied he had never seen him. Witness told him he saw him at witness' house in Burgess, Sunday morning, August 15, about five o'clock, and rehearsed to defendant what was said and done on that occasion. Witness told defendant he was the man witness saw there, talked with and sold gasoline to. The witness told defendant there could be no question about his being the man; that he was a different type from the ordinary man, and witness would know him among a thousand. Witness told defendant he had better tell Bradfield where his car was. Defendant's only reply to witness was a request to see the sheriff. The sheriff took him to some other room.

Bennett, the sheriff, testified he took defendant into a room of his residence. He was in and out of the jail and was present part of the time when Bradfield and Hunter were talking to defendant in the jail. When he went into his residence with defendant the latter inquired if his wife had been saying anything about him, and the sheriff told

him she had said defendant was implicated in the theft of "the Shiery car." Defendant said he was not, and asked if what he said could be used against him in court. The sheriff told him it could be. Defendant said he knew something about the Bradfield car but nothing about the Shiery car. The sheriff advised him to talk with Bradfield and tell the truth. Defendant said if they sent him over they would send others along with him. The two then went into the sheriff's front room, where Bradfield was. Defendant told Bradfield he was across the fence watching the house while Aldrich was getting the car. Witness never heard him say where the car was. Witness was present when Bradfield told defendant, in the jail, he was the man or one of the men that stole the car, and defendant made no denial or reply.

The foregoing is the substance of the most material evidence on the part of the prosecution.

Defendant testified in his own behalf and denied stealing the car or knowing anything about who stole it. He testified he stayed all night in LaHarpe August 13 and spent the 14th there. He left on a train in the evening for Burnside, which is ten or twelve miles from LaHarpe and where his father and mother lived, and arrived there about eight o'clock in the evening. He went first to his father's store and found his father and mother both there. From the store he went to the residence, where he stayed all night. He testified he was invited to his mother's birthday dinner Sunday, August 15. He slept at his parents' home all night, ate breakfast there and about nine o'clock went to the store. He returned to his parents' home about 10:30, ate dinner there and left on a train about 2:30. He either denied or said he did not remember the statements Bradfield, Hunter and the sheriff testified that he made about stealing the car. He denied he was at Burgess and procured gasoline from Hunter the morning of August 15, and said he never saw Hunter until he saw him in the jail at Carthage. Defend-

ant's father and mother testified he was at their house the night of August 14, stayed there until the afternoon of the 15th and ate breakfast and dinner there. They fixed the date as the date of Mrs. Todd's birthday dinner, which they testified was given the day previous to her birthday, which was the 16th. Defendant's married sister, Mrs. Pettit, and her husband, testified they were at the birthday dinner, August 15, and that defendant was there also.

It is earnestly contended that the evidence was insufficient to warrant a verdict of guilty; that it was an impossibility for defendant to have been at Bradfield's residence about one o'clock the morning of the 15th, and at Burgess, sixty miles from LaHarpe, about daylight, if he stayed all night at his parents' home in Burnside the night of the 14th, ate breakfast and dinner there the 15th and remained until 2:30 in the afternoon,—and this, it must be conceded, is true if the alibi was proven by credible testimony. It is apparent the jury did not credit that testimony. They would not be warranted in disregarding it from mere caprice, but they were the judges of the credibility of the witnesses and the weight that should be given their testimony. It may well be that the mere fact of the relationship of the alibi witnesses to defendant would not, alone, afford justification for the jury disregarding their testimony. Defendant was charged with the crime of stealing the Bradfield automobile and was in jail at Carthage for a time, a few days after the theft occurred. He was indicted at the October, 1920, term of court and was tried in April, 1921. A rather unusual circumstance occurred in the testimony of the alibi witnesses. Its importance does not appear to have been appreciated by them or to have been known to defendant's counsel until the trial was in progress. Defendant's father testified he never talked with anyone about his son being at his house the night of August 14 and the following day except his wife and that he never talked with defendant about it. Defendant's mother testified that she never talked

with anyone about it but her husband, except she spoke some things to defendant but never even talked with his attorney about it. Defendant's sister testified that the night before she was on the witness stand was the first time her attention had been called to defendant having been at the birthday dinner, August 15, and that her recollection was then refreshed and she remembered it. She did not know before that she was to be a witness. Defendant's brother-in-law testified that he did not know he was to be called as a witness until the day before he testified; that he, his father-in-law and defendant talked the matter over the day before he gave his testimony and agreed that the birthday dinner was August 15. This may have caused, and undoubtedly did cause, the jury to look upon the testimony with some suspicion. The witnesses were apparently intelligent and their character apparently such that one cannot help being impressed that it was remarkable that it did not occur to the witnesses, or some of them, before the trial, that proof that defendant was in Burnside all the night of the 14th and the greater part of the following day would be important in his defense of the charge of stealing the car. Then, too, no other person appears to have seen defendant in Burnside the night of the 14th or the following day. Laura Skinner, a resident of Burnside, testified she was at the depot there to meet a friend who came on the same train defendant claims to have arrived on. She knew defendant but did not see him alight from the train. Only a few persons got off at Burnside. In view of the fact three witnesses testified to admissions by defendant that he stole the car, two of whom were in no way interested and one of whom testified positively that he saw defendant in Burgess early the morning of the 15th in possession of the car, we cannot say the judgment should be reversed because not supported by the evidence.

The court at the request of the People gave an instruction on the defense of alibi which it is claimed was re-

versible error. The instruction told the jury that although
the evidence accounted for movements of defendant some
part of the time before and at the time of the commission
of the crime, before it would authorize an acquittal of the
defendant "it must appear that at the time of the commis-
sion of the crime charged in the indictment the defendant
was at another place so far away, under such circumstances,
that he could not with ordinary exertion have reached the
place where the crime was committed so as to have partici-
pated therein." It is argued that this was, in effect, telling
the jury that even if they believed Hunter was mistaken
about defendant being in Burgess the morning of the 15th,
and even if they believed defendant was in Burnside at the
time it was claimed the car was stolen, that would not be
sufficient to authorize an acquittal "unless they believed cer-
tain other things were proven as defined in the instruction."
It is contended that the instruction made distance from the
place of the crime the controlling thing. Reliance is placed
on the decisions in *Waters* v. *People,* 172 Ill. 367, and *Peo-
ple* v. *Fisher,* 295 id. 250. In each of those cases an instruc-
tion was given on the defense of alibi and held erroneous.
The instructions were not, however, the same as the instruc-
tion here complained of. The instructions condemned in
those cases told the jury that before the defense of alibi
would be "entitled to consideration" it must be proved that
at the time the crime was committed defendant was at an-
other place so far away or under such circumstances that
he could not with ordinary exertion have reached the place
where the crime was committed. In the *Fisher case* the
court said the effect of such an instruction was to say that
the defense of alibi was not entitled to be considered by
the jury unless a complete and perfect alibi was proved.
This is not the case with the instruction here complained
of. The jury were left free to consider the testimony on
that defense. In *Miller* v. *People,* 39 Ill. 457, the court said
the theory of an alibi is that the defendant was so far re-

moved from the scene of the crime when it was committed as to make it impossible he could have committed it, but the prisoner is entitled to the benefit of any reasonable doubt the jury may entertain on that point. This was, in effect, repeated in *People* v. *Stoneking*, 289 Ill. 308. We do not think the instruction placed any burden on the defendant beyond what the law authorizes. The defendant's rights were well guarded by instructions given on his behalf. The jury were told it was not necessary to prove the defense of alibi beyond a reasonable doubt, but it was sufficient to entitle defendant to an acquittal if from the evidence they had a reasonable doubt whether he was present at the time and place the crime was committed.

Complaint is made of People's instruction 19. It purports to be a definition of what is a reasonable doubt. It has been given a great many times and no judgment has ever been reversed because it was given. The practice of giving a number of instructions on the subject of what is a reasonable doubt, including the one here complained of, has in recent years been frequently condemned. (*People* v. *Wallace*, 279 Ill. 139; *People* v. *Moses*, 288 id. 281; *People* v. *Miller*, 292 id. 318; *People* v. *Seff*, 296 id. 120.) In this case the instruction complained of is the only one given for the People on that subject, and while it does not give any clearer understanding of the meaning of reasonable doubt than the words themselves import it was not erroneous, and being the only one given for the People on that subject could not have prejudicially affected defendant.

It is claimed the court committed reversible error in restricting the cross-examination of the witness Bradfield. On cross-examination of the witness counsel for defendant inquired if he had not caused the arrest of Bert Byers in Davenport for stealing the car and if he did not dismiss the complaint and give Byers $100 to come to Hancock county and testify at the preliminary hearing of defendant and Aldrich on the charge of stealing the car. The court sus-

tained the objection of the People to the question and it was not answered. The general rule is that cross-examination should be confined to what was brought out on direct examination, but it is permissible in a proper case, on cross-examination, to ask an interested or hostile witness concerning acts or declarations showing bias and prejudice for the purpose of affecting the credibility of the witness. In such matters large discretion is committed to the trial judge in controlling the cross-examination, and while great latitude is permissible the ruling of the court in this case was not reversible error.

We are of opinion this court would not be warranted in reversing the judgment for any of the errors alleged, and it is affirmed.          *Judgment affirmed.*

---

(No. 14152.—Reversed and remanded.)
NICOLAUS H. HULTIN, Appellee, *v.* T. HENRY KLEIN *et al.* Appellants.

*Opinion filed December 22, 1921—Rehearing denied Feb. 9, 1922.*