THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN BUSKIEVICH *et al.* Plaintiffs in Error.

*Opinion filed June 23, 1928.*

1. CRIMINAL LAW—*extent of cross-examination rests largely in discretion of court.* The cross-examination of a witness should be kept within fair and reasonable limits, and the extent to which it may go is largely within the trial court's discretion.

2. SAME—*what evidence is admissible although it tends to show another offense—instruction.* Any evidence which tends to identify the accused as the person or one of the persons who committed the crime charged is admissible even though it may tend to show him guilty of another offense, and in a prosecution for murder committed during a hold-up, testimony that one of the defendants, a few months before the crime, had carried off from the witness' camp a shot-gun which the evidence shows was used during the hold-up is admissible, and it is proper to refuse an instruction that the jury should not consider any testimony of the witness concerning the commission of another offense.

3. SAME—*what instruction as to reasonable doubt will not reverse.* An instruction that the reasonable doubt the jury is permitted to entertain to authorize an acquittal must be as to the guilt of the accused on the whole evidence or "some particular fact necessary to constitute the crime" will not require reversal on the ground that it does not define the essential material facts which constitute the crime where other instructions set forth such material and necessary facts.

4. SAME—*what instruction as to circumstantial evidence may be refused.* The degree of certainty required for conviction upon circumstantial evidence is the same as that required for direct evidence, and there is no legal distinction between them so far as their weight and effect are concerned; and it is not error to refuse an instruction that the jury must exercise great caution in acting upon circumstantial evidence, thus attempting to distinguish such evidence and apply to it rules different from those applicable to direct evidence.

5. SAME—*conviction may be had on testimony of accomplices.* While the testimony of accomplices must, as a matter of law, be received with suspicion and acted upon with great caution yet it is nevertheless competent evidence, and a conviction may be sustained on such testimony, uncorroborated, if it is of such a character as

to convince the jury, beyond a reasonable doubt, of the guilt of the accused, notwithstanding none of the occurrence witnesses, in a prosecution for murder committed during a hold-up, have identified the accused.

6. SAME—*when, only, will verdict of guilty be disturbed on review.* The Supreme Court will not disturb a verdict of guilty or reverse a judgment of conviction on the ground that the evidence is insufficient to convict, unless the verdict is palpably contrary to the weight of the evidence or the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of guilt.

HEARD, J., dissenting.

WRIT OF ERROR to the Circuit Court of Sangamon county; the Hon. FRANK W. BURTON, Judge, presiding.

JOHN G. FRIEDMEYER, and EDWARD PREE, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, H. E. FULLENWIDER, State's Attorney, and ROY D. JOHNSON, (J. M. WELDON, and L. E. SULLIVAN, of counsel,) for the People.

Mr. CHIEF JUSTICE DEYOUNG delivered the opinion of the court:

John Buskievich, John Parks, Frank Logan, alias Frenchy, and Charlie Miller, alias Shorty, were indicted in the circuit court of Sangamon county for the murder of Edmund Hansen. Buskievich and Parks were apprehended and tried twice. Upon the first trial the jury disagreed. The second trial resulted in a verdict finding Buskievich and Parks guilty and fixing the punishment of the former at thirty years and of the latter at twenty years' imprisonment in the penitentiary. Their ages were found to be twenty-three and nineteen years, respectively. Motions for a new trial and in arrest of judgment were denied, judgment was rendered upon the verdict, and Buskievich and Parks were committed to the Southern Illinois Penitentiary. They prosecute this writ of error to review the record.

On October 29, 1925, Edmund Hansen and Mabel Hansen, his wife, were traveling in an automobile from East St. Louis to Chicago. They reached the roadhouse of Edward Reilly, about three miles southwest of Springfield, shortly after 11:00 P. M. Rain, sleet and snow were falling, the night was stormy and the road was slippery. For these reasons they decided to remain at the roadhouse until the next morning. The roadhouse was located on the south side of the highway, facing north. Through a front hall entrance was gained to the northeast and northwest rooms. South of the northeast room was the main dining room. Across a hallway, west of the dining room, was another room also used for dining purposes. A wooden door opened from the dining room into this hallway. The kitchen was located south of the dining rooms. Hansen and his wife ordered a meal and it was served in the main dining room. After finishing their meal they remained seated at the table and conversed with Reilly, the proprietor. While they were so occupied three men, Charles Fernandez, Patrick Healy and Robert Lee, entered, ordered coffee and sandwiches and were served in the northeast room. Shortly before two o'clock in the morning, while Hansen, Mrs. Hansen and Reilly were still at the table in the main dining room and Fernandez, Healy and Lee were in the northeast room, two masked men entered the house through the front door. They passed into the northeast room and one of them discharged a sawed-off shotgun into the floor. Re-loading the gun he advanced toward the main dining room, and as he reached it he again shot into the floor and commanded those present in both rooms to hold up their hands. They complied and the other bandit searched them and took money and valuables from them. Immediately after the two masked men gained entrance through the front door, two other men, also masked, appeared at the kitchen door, entered the kitchen and with drawn revolvers commanded Mrs. Reilly, who was engaged in the preparation of food,

to put up her hands. She asked them not to make trouble, but upon their insistence she complied with their command and they took five or six dollars from her apron pocket. One of these men then forced her to go to the main dining room. About the time she entered this room her husband struck the bandit who had the sawed-off shotgun and they grappled each other and fell to the floor in the northeast room. Mrs. Reilly went to her husband's assistance and wrenched the shotgun from the bandit's hands. The latter jumped to his feet and his face was bleeding. Mrs. Hansen told Mrs. Reilly to shoot him, but Mrs. Reilly answered that the gun would not discharge. Reilly regained his feet and he and the bandit fought with chairs until the bandit ran from the house. While the struggle between Reilly and the first bandit continued, the one who had forced Mrs. Reilly to leave the kitchen fired a shot from a revolver and the bullet entered the east wall of the northeast room. He fired a second shot, which passed over Reilly's head and imbedded itself in the north wall of the same room. He then started for the hallway leading to the west room. Hansen grabbed a chair and advancing swung it at him. The bandit passed into the hallway, shut the door after him and immediately fired a shot, which, after passing through the door, entered Hansen's left breast, penetrated his body and caused his instant death. All the bandits disappeared, leaving the sawed-off shotgun in Mrs. Reilly's possession. Besides other money and valuables taken, Fernandez was robbed of $46 and Reilly of more than $700.

Harold Cline, a resident of Springfield, nineteen years of age, was called by the prosecution and testified as follows: On the evening of October 29, 1925, he drove his father's Chevrolet sedan automobile to Arkin's pool room, on Sixth street between Jefferson and Madison streets, and there met John Parks, one of the plaintiffs in error. He and Parks then drove to a soft drink parlor in the basement of a building at Eighteenth and Cook streets, where they played

cards until about ten o'clock. They returned to Arkin's pool room, where they met Buskievich, the other plaintiff in error, and two men, one called Shorty and the other Frenchy. Cline, the plaintiffs in error, Shorty and Frenchy left the pool room in the automobile and stopped at a gasoline station at Third street and Capitol avenue, where Cline bought five gallons of gasoline, which he caused to be charged to his employers, Franz & Summers, plumbers, and for which he signed a receipt. After leaving the gasoline station the men drove to the home of Arthur Hershey, a short distance southeast of the city, stopping on the way to eat at a restaurant at South Grand avenue and Eleventh street. Cline followed the other four into Hershey's house and all except Cline asked Hershey for guns. Hershey produced a sawed-off shotgun and two revolvers. These firearms were placed in the automobile, and Cline, with his four companions, drove away, first to Riverton, a village about seven miles northeast of Springfield, and then back through that city to the junction of the St. Louis and Jacksonville hard-surfaced highways, southwest of Springfield. When this point was reached they had passed Reilly's roadhouse, and Cline was directed by one of the men in the automobile to turn around and stop at that house. The car was driven off the road and stopped about a block and a half from the house and the lights of the car were turned out. Buskievich, Parks, Frenchy and Shorty walked toward Reilly's house and returned to the car in fifteen minutes, stating that it was cold and that they wished to warm themselves. They soon went back to the roadhouse, and shortly thereafter Cline heard several shots. He drove up to the roadhouse and stopped. Frenchy and Shorty first entered the car, followed by Parks and Buskievich, and Cline was told to drive at a high rate of speed. They drove back to Hershey's house, and after entering it placed the revolvers upon the table. Parks gave two dollars to each of his companions. Blood was discovered upon Frenchy's cap, shirt and hands.

After the lapse of a few minutes Cline drove Frenchy, Shorty, Parks and Buskievich to their respective homes and reached his own home shortly after three o'clock in the morning of October 30. He was arrested on Sunday morning, the first of November, and made three successive statements or confessions of the crime to the authorities.

Silas F. Haines, an attendant at the gasoline station at Capitol avenue and Third street, corroborated Cline's statement concerning the sale of the gasoline on the evening of October 29. He also identified the receipt which Cline had signed for the gasoline.

Arthur Hershey testified that when the men called at his home on the night of October 29 he had retired; that he arose and admitted them, Cline, having stopped at his car, being the last to enter; that Parks said they "had a job to do" and wanted to get some guns they had previously left at Hershey's house; that there were two sawed-off shotguns, a Colt Special revolver, a foreign-made revolver, a flashlight and a blackjack, and that a sawed-off shotgun was given to Frenchy, the Colt revolver to Buskievich, the foreign-made revolver to Parks and the blackjack to Shorty. Hershey further testified that about three o'clock in the morning he was again awakened, and upon opening the door admitted Buskievich, Parks, Frenchy and Shorty; that Frenchy had his face and shirt smeared with blood, and upon inquiring what it meant, Parks answered, "We made a mess of this bloody job;" that upon further inquiry whether any person had been killed, Buskievich said, "I don't know whether we killed him or not, but we had to put the boots to him;" that Frenchy asked for and obtained a basin of water to wash his face, and Parks told him to burn his clothes, which he agreed to do; that upon the discovery that the sawed-off shotgun which had been given to Frenchy was missing, Parks asked him whether he had brought it back, and Frenchy answered that it must have been left on the floor in the roadhouse; that Buskievich

inquired about the money that had been taken, whereupon Parks withdrew a roll of one dollar bills from his pocket and gave two dollars to each of his companions and to the witness; that Buskievich then asked whether that was all the money, and Parks, throwing up his hands, exclaimed, "If you don't believe me, search me;" that Buskievich took the shells, loaded and empty, from his revolver and laid both shells and revolver on the oven of the cook stove; that Buskievich requested Hershey to throw the empty shells in the fire burning in the stove; that Parks still had his revolver, which had not been fired, and that the blackjack, as well as the sawed-off shotgun, was missing. The revolvers were left at Hershey's house, and he was told that some person would call for them shortly. He was also cautioned not to speak. Between two and three o'clock in the morning of October 31 James Herbert, Hershey's brother-in-law, came in a taxicab driven by one "Butch" to get the revolvers, and the Colt and foreign-made revolvers were delivered to him. Five or six days after Hansen's murder Hershey made a statement concerning the crime to the State's attorney. He was asked to look for the empty shells and found them in the ashes near his house. These shells were surrendered to the State's attorney and were identified by Hershey on the trial.

James Herbert testified that he is a coal miner; that about 2:00 A. M. on the day following the murder at Reilly's roadhouse he went to the home of Arthur Hershey, his brother-in-law, for some guns which had been left there and which Hershey had requested him to take away; that a Colt and a foreign-made revolver and a sawed-off shotgun were delivered to him; that he had seen the Colt revolver in Parks' and Buskievich's possession; that he gave this revolver to Ora Butcher, the taxicab driver, and that on October 30, about noon, he met Parks and asked him who did the shooting at Reilly's roadhouse, and that Parks

answered that he did not know, because he was on the back porch when the shooting occurred.

Philip Maron, a Spaniard and a laborer, testified that he bought the Colt revolver from Ora Butcher on November 8, 1925; that he had it two days, when a representative of the State's attorney's office, accompanied by Butcher, called at his home and asked for the revolver and witness surrendered it to him. T. P. Sullivan, the State's attorney's representative, corroborated Maron's testimony concerning the surrender of the revolver, and testified that it had been in the possession of the State's attorney's office since November 10, 1925. The sawed-off shotgun which Mrs. Reilly took from one of the bandits, and the bullet which killed Hansen, were introduced in evidence.

In defense of the charge against them, the plaintiffs in error sought to prove an alibi. Mary Warner and Marie Ketroy, two young women, testified that they attended the Gaiety Theatre, in Springfield, on the evening of October 29, 1925; that after the performance they viewed the show windows of certain stores in the business district of Springfield, and while waiting to board a street car to go to their homes saw Buskievich leaving the Strand Theatre, and that he walked north on Sixth street.

Nellie Brazitis, a housewife, testified that Buskievich and his father occupied one of the rooms in her house; that on the evening of October 29, 1925, she ironed clothes in the kitchen until eleven o'clock; that the father had retired before that hour; that the son came home about 11:30 P. M. and the father opened the outside door to admit him, and that she heard them talking for about five minutes.

John Buskievich, Sr., corroborated the testimony of Mrs. Brazitis concerning the hour of his retirement, the arrival of his son and the latter's admission to the house on the night in question. The father added that he asked his son whether he had looked for a job, and upon receiving an affirmative answer, further inquired whether he had ob-

tained one. The son replied that he had not. Both then retired, and when the father arose the next morning at six o'clock the son was in bed.

Buskievich testified that on the evening of October 29, 1925, he attended the Strand Theatre from 9 :00 until 11 :00 P. M. ; that as he left the theatre he saw Mary Warner and Marie Ketroy waiting for a street car and greeted them; that he walked to his home, more than a mile distant, reaching it about 11 :30 P. M. ; that he did not have a key, and, knocking on the door, his father admitted him; that after a short conversation with his father he retired and did not arise until the next morning at about nine o'clock; that he neither saw Cline nor rode with him in an automobile on the night in question and did not participate in the crime for which he was indicted.

Benjamin F. Best, a switchman in the employ of the Chicago and Alton Railroad Company, and Albert Wolfe, a cab driver, both testified that they were present in Arkin's pool room on the evening of October 29 and saw Parks there; that they played cards with him and a fourth man, named Yocum, from half-past seven until after nine o'clock, when Parks left, stating that he was going to see a show, and invited Wolfe to accompany him. Neither of these witnesses saw Cline in the pool room on that evening.

Jack Bradley, who conducted the pool and card room at Eighteenth and Cook streets, and Harold Sprinkle and Paul Thompson, all residents of Springfield, testified that on October 29, 1925, they were in that pool room from 7 :30 until after 10 :30 P. M., and that Parks did not enter the room during that time.

William H. Paschall testified that on October 29, 1925, he drove a Dodge automobile from Bloomington, through Springfield, to Jacksonville and thence back to Springfield, reaching the latter city between 11 :15 and 11 :30 P. M.; that he saw Clarence Parks in front of a drug store at Sixth and Monroe streets, in Springfield, and inquired of

him about his brother Frank; that while he was so engaged in conversation plaintiff in error Parks approached from the north and Clarence called him to the automobile; that it was a stormy night and the witness asked the two brothers whether they were going home, and when they answered affirmatively, he drove them there and saw them approach the front door of the house.

Clarence Parks corroborated Paschall's testimony and stated that he and his brother John arrived at home about midnight; that to reach their room it was necessary to pass through their parents' bed-room; that when they did so their mother asked about the weather, and John answered that is was stormy; that they went to the kitchen to read the newspaper but their mother told them to retire; that the witness and John slept together, and that the latter was asleep when the witness arose the next morning, at half-past seven o'clock.  Bertha Parks, the mother of Clarence and John, corroborated Clarence's testimony with respect to the time they came home and what they did afterwards. She stated that she saw John the next morning at eight o'clock.

John Parks, the father of the plaintiff in error Parks, conducted a barber shop on the lower floor of the building in which he resided.  In addition to corroborating the testimony of his wife and of his son Clarence, he stated that he arose shortly after Clarence and John had retired on the night in question and passed through their room to get a drink of water; that he remained awake until one o'clock, and that he saw John in the shop down-stairs at eight o'clock the next morning.  ·

Plaintiff in error Parks testified that on October 29, 1925, he was at Arkin's pool room from 7:30 until 9:15 P. M., playing cards with Best, Wolfe and Yocum; that he left and attended a certain theatre until eleven o'clock; that immediately thereafter he met his brother Clarence at Sixth and Monroe streets and was there introduced to William H.

Paschall, and that after a short conversation Paschall took Clarence and himself home. His testimony with reference to what occurred after he was at home is consistent with that given by his parents and brother, except that he stated he arose at about nine o'clock the following morning.

Several witnesses were called by the prosecution on re-buttal. Arthur Smith, a plumber, testified that he once owned the shotgun which had been admitted in evidence; that he identified it by a copper wire and the broken butt; that the gun was of full size while it was in his possession, and that on August 16, 1925, at about 5:00 A. M., plaintiff in error Parks and two men, one named Herbert and the other Red, came to the camp of the witness and took the gun with them.

James Herbert testified that he was acquainted with Arthur Smith; that early in the morning of August 16, 1925, he, plaintiff in error Parks, Lee Antle and Paul Thompson were present at Smith's camp when the shotgun was exhibited; that it had a long barrel at the time, and that he had seen the gun in Parks' possession many times between that day and October 29, 1925.

Arthur Hershey testified that he had seen the shotgun in the possession of Parks and Thompson, and that on the 22d or 23d day of August, in Thompson's presence, Parks sawed off the barrel of the gun with a hack-saw.

T. P. Sullivan testified that he met Clarence Parks on Sunday afternoon, November 1, 1925, and asked him whether he knew where his brother John was on the night of the 29th day of October, and that Clarence answered, so far as that night was concerned he neither knew the where-abouts of John nor when he came home.

The substance of the material evidence in the case, adduced from thirty-four witnesses, is set forth in the foregoing statement. Reversal of the judgment is sought upon contentions relating to the exclusion and admission of evi-

dence, the giving and refusing to give instructions, and the weight of the evidence.

The trial court, it is asserted, unduly restricted the cross-examination of Cline touching his credibility, and of Cline, Hershey and Herbert with reference to their interest in the case and the influences under which they testified. The plaintiffs in error do not show wherein they were prejudiced by the restrictions of which complaint is made. A review of the cross-examination of each of these witnesses fails to disclose any basis for the contention. Several of the questions to which objections were sustained were objectionable in form, and answers to none of the questions could have shed any particular light upon the inquiries sought to be made or have been vital to the rights of the plaintiffs in error. The cross-examination of a witness should be kept within fair and reasonable limits, and the extent to which it may go is largely within the trial court's discretion. (*People* v. *Andrews,* 327 Ill. 162; *People* v. *Harris,* 263 id. 406; *People* v. *Strauch,* 247 id. 220.) No abuse of that discretion appears in the present case.

The testimony on rebuttal relating to the taking of the shotgun from Arthur Smith's camp on August 16, 1925, it is insisted, was erroneously admitted. Parks denied knowledge or possession of the gun or that he had taken any part in the commission of the crime. By this testimony it appeared that the gun left at the roadhouse at the time Hansen was murdered had been taken from Smith's camp more than two months before by three persons, of whom Parks was one, and that Parks had possession of the gun prior to October 30, 1925. The testimony was admissible, not for the purpose of showing the commission of an independent offense in which Parks was implicated, but because it had a tendency to establish a link in the chain of evidence connecting Parks with the murder of Hansen, the subject matter of the instant indictment. Any evidence which tends to identify the accused as the person or one of the persons who

committed the particular crime charged is admissible even though it may tend to show him guilty of another offense. *People* v. *McQuirk*, 312 Ill. 257; *People* v. *Horn*, 309 id. 23; *People* v. *Mandrell*, 306 id. 413.

It is contended that certain instructions given at the request of the prosecution were prejudicially erroneous. The third instruction contained the following sentence: "The reasonable doubt that the jury is permitted to entertain to authorize an acquittal must be as to the guilt of the accused on the whole evidence or some particular fact necessary to constitute the crime." The complaint made is, in substance, that the clause "or some particular fact necessary to constitute the crime" singles out a fact which the jury erroneously might believe to be a constituent element of the crime charged. The jury were told by the third instruction that a reasonable doubt of the guilt of the defendants upon the whole evidence authorized their acquittal. The clause of which complaint is made was in the alternative, and if that clause led the jury erroneously to believe that a certain fact was a constituent element of the crime charged and that a reasonable doubt concerning the existence of that fact would authorize an acquittal, it is not easily discerned how the plaintiffs in error could have been prejudiced thereby. It is true that an instruction such as the third should not be given without defining the essential material facts constituting the crime with which the defendant is charged. (*People* v. *Cramer*, 298 Ill. 509; *People* v. *Birger*, 329 id. 352.) Other instructions, however, correctly informed the jury in respect to the law upon the subject under consideration, and when all the instructions are taken together, the giving of the third instruction was not prejudicial to the plaintiffs in error.

The seventh instruction was as follows:

"The court instructs the jury that you are at liberty and it is your duty to consider all the evidence in the case touching the question of alibi introduced by the defense, as well

as that introduced by the prosecution, and that the reasonable doubt the jury is permitted to entertain must be as to the guilt of the accused on the whole evidence or some particular fact necessary to constitute the crime."

The objection urged to this instruction is, that the concluding clause, "or some particular fact necessary to constitute the crime," is misleading when the purpose of the instruction, namely, its application to the evidence offered to establish an alibi, is considered. The instruction did not state what particular facts were necessary to constitute the crime charged in the indictment nor did it purport to direct a verdict. The court in other instructions set forth the material and necessary facts it was incumbent upon the prosecution to establish by evidence before a conviction could be obtained. In this situation the jury could not have been misled by the seventh instruction.

The eighth instruction concerned the defense of an alibi. The same instruction was given and approved in *People* v. *Todd,* 301 Ill. 85, and in *People* v. *True,* 314 id. 89. Plaintiffs in error contend that the jury might infer from the language of the instruction that the evidence in the present case accounted for only a portion, and not all, of their movements and whereabouts at the time the crime was committed, and hence that the instruction was prejudicial to them. No such inference is justified by the language of the instruction.

Complaint is also made of the court's refusal to give two instructions requested by the plaintiffs in error. The first instruction concerned circumstantial evidence and told the jury that they should exercise great caution in acting upon it. The jury were informed by instructions given at the request of the plaintiffs in error that to warrant their conviction each allegation of the indictment constituting the crime charged, as explained in the instructions, must be proved by competent evidence beyond a reasonable doubt, and that all the facts and circumstances proved should not

330—35

only be consistent with the guilt of the plaintiffs in error, but inconsistent with every reasonable hypothesis or conclusion other than that of their guilt. The degree of certainty required for conviction upon circumstantial evidence is the same as that prescribed for direct evidence. (*Spick* v. *State*, 140 Wis. 104.) There is no legal distinction, so far as their weight and effect are concerned, between direct and circumstantial evidence. If the evidence in a criminal case, whether direct or circumstantial, satisfies the jury of the guilt of the accused beyond a reasonable doubt they should convict, otherwise they should acquit. An attempt in a charge to the jury to classify evidence as direct and circumstantial, making different rules applicable to each, would only serve to confuse the minds of the jury and divert their attention from the main issue. (*State* v. *Rome*, 64 Conn. 329; 1 Wharton on Crim. Evidence,—10th ed.—sec. 20; Wills on Circumstantial Evidence,—5th ed.—Am. notes, p. 46*h*; *Spick* v. *State, supra.*) It was not error to refuse the instruction.

The other instruction which it is contended should have been given informed the jury that they should not consider the testimony of the witness Arthur Smith concerning the commission of another offense as any evidence of guilt in the present case. Smith's testimony tended to prove the offense charged, and it was not rendered inadmissible because it might have a tendency to establish the commission of some other offense. Since the testimony was admissible and the requested instruction unqualifiedly required its rejection, the instruction did not state the law correctly and was properly refused. *People* v. *McQuirk, supra.*

The verdict, it is insisted, is against the weight of the evidence and contrary to the instructions of the court, and hence the trial court erred in denying the motion for a new trial. The murder of Hansen at Reilly's roadhouse in the course of a robbery is not denied. None of the persons in the roadhouse at the time the crime was committed iden-

tified the plaintiffs in error. The direct evidence implicating them in the commission of the crime was adduced from accomplices who had previously confessed. This fact is emphasized, and it is insisted that upon the evidence a reasonable doubt of the guilt of the plaintiffs in error arises. While the testimony of an accomplice must, as a matter of law, be received with suspicion and acted upon with great caution, yet it is nevertheless competent evidence, and a conviction may be sustained on such testimony, uncorroborated, if it is of such a character as to convince the jury, beyond a reasonable doubt, of the guilt of the accused. (*People* v. *Birger, supra; People* v. *Looney,* 324 Ill. 375; *People* v. *Maggio,* 324 id. 516.) At the request of the plaintiffs in error the jury were instructed that they should act upon the testimony of Cline and Hershey with great care and caution and subject it to careful examination in the light of all the other evidence in the case. There were facts and circumstances in evidence which corroborated the testimony of Cline and Hershey. The plaintiffs in error sought to establish an alibi. It was the province of the jury to weigh the evidence and to determine the facts. This court will not disturb a verdict of guilty or reverse a judgment of conviction on the ground that the evidence is insufficient to convict, unless the verdict is palpably contrary to the weight of the evidence or the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. (*People* v. *Holton,* 326 Ill. 481; *People* v. *Nusbaum,* 326 id. 518; *People* v. *Hicketts,* 324 id. 170; *People* v. *Thompson,* 321 id. 594.) It cannot be said that the verdict in the instant case is not supported by the evidence.

The judgment of the circuit court of Sangamon county is affirmed.                          *Judgment affirmed.*

Mr. JUSTICE HEARD, dissenting.