(No. 22725.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ALICE L. WYNEKOOP, Plaintiff in Error.

*Opinion filed December 20, 1934—Rehearing denied Feb. 12, 1935.*

FRANK J. TYRRELL, and DARROW, SMITH, CRONSON & SMITH, (WILLIAM W. SMITH, and EDWARD M. KEATING, of counsel,) for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and HENRY E. SEYFARTH, of counsel,) for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

Alice L. Wynekoop, who brings her case here by writ of error, was convicted of murder by a jury in the criminal court of Cook county and sentenced to the Women's Reformatory at Dwight for twenty-five years. She is a widowed physician sixty-three years old and the mother of two sons and a daughter. At the time of the homicide she resided in her own property in Chicago. She had office rooms in the basement of her home and was engaged in the active practice of her profession. One of her sons, Earle W. Wynekoop, and his wife, Rheta, lived with her. A school teacher, Enid Hennessey, also occupied a room in her home. At about 10:00 o'clock on the night of November 21, 1933, in response to a radio call, the police went to the home of Mrs. Wynekoop, whom we will call the defendant. Upon their arrival she exclaimed: "Something terrible has happened; come on down-stairs and I will show you." She then conducted them to her office, where the police found the dead body of Rheta on an operating table. A sheet and blanket covered the scantily clad body, excepting the head and feet. Blood stains were noticed on the floor, on the table, the sheet, the blanket and on Rheta's garments. Near the head of the body, on a raised portion of the operating table, a revolver was found under a small cloth. Three discharged cartridge cases were also found.

An examination of the body disclosed that Rheta had been shot once. The bullet had entered her back and pursued an upward course, lodging under the skin near her left nipple. Her face bore some scratches and other parts of her body were abraded and discolored. A post-mortem examination disclosed a hemorrhage along the course of the bullet, with the left chest cavity full of blood. The cause of the death was fixed as a result of the gunshot wound in the left chest, hemorrhage and shock. Because of the extensive hemorrhage in the chest cavity it was the opinion of medical examiners that Rheta was alive when the bullet entered her lung. This examination further disclosed the presence of chloroform to the amount of nine and one-half grains in those portions of the body which were examined. In the same room with the body the police picked up a bottle of chloroform which the defendant pointed out to them. It was nearly empty and stood in a sink near the operating table.

In response to interrogations by the authorities the defendant made and signed three different statements within a few days following the death of Rheta. The first was made the night the body was found by the police and while the defendant was still in her home and not in custody. This statement, in substance, was, that about 8:30 P. M. she entered her office for the purpose of obtaining some medicine for herself and the teacher who roomed at her home. She said she saw Rheta lying on the operating table in the office covered with a blanket. Thinking that Rheta was dead, the defendant said she called her daughter, Catherine, who is also a physician and stationed at the Cook County Hospital. Catherine found that Rheta was dead, and the defendant then called for an undertaker. The defendant then accounted for the killing of her daughter-in-law by relating that her office had been broken into previously and money taken, and she supposed that Rheta had been killed during an attempt of some per-

son to obtain money from her. She said that the revolver belonged to her son Earle, who at the time of the death of his wife was on his way to Arizona on a business mission. A second statement made to the police was substantially like the first one. The main portion of the third statement, made after the defendant had been taken into custody, reads as follows:

"Rheta was concerned about her health and frequently weighed herself, usually stripping for the purpose. On Tuesday, November 21, after luncheon, at about 1:00, she decided to go down to the loop to purchase some sheet music that she had been wanting. She was given money for this purpose and laid it on the table, deciding to weigh before dressing to go down-town. I went to the office. She was sitting on the table practically undressed and suggested that the pain in her side was troubling her more than usual. I remarked to her, since it was a convenient interval during the month for an examination, we would just as well have it over. She complained of considerable soreness, severe pain and tenderness. She thought she would endure the examination better if she might have a little anæsthetic. Chloroform was conveniently at hand and a few drops were put on a sponge. She was allowed to pour a little more on the sponge. She breathed it very deeply. She took several deep inhalations. I asked her if I was hurting her, and she made no answer. Inspection revealed that respiration had stopped. Artificial respiration for about twenty minutes gave no response. Sthethoscopic examination revealed no heart beat. Turning the patient quickly on her side and examining posteriorly as well as anteriorly, there was no sign of life. Wondering what method would ease the situation best to all and with the suggestion offered by the presence of a loaded revolver, further injury being impossible, with great difficulty one cartridge was exploded at a distance of some half dozen inches from the patient. The gun dropped from the hand.

The Germans say 'the hand,' indicating the possessive case. The scene was so overwhelming that no action was possible for a period of several hours." * * *

On this review the principal contention made in the defendant's behalf arises out of the effort of the People to prove the third statement. The defendant objected to its admission and asked for the exclusion of the jury and a hearing as to the facts and circumstances under which the statement was procured. After the jury had been taken from the court room the State's attorney contended that the statement was not a confession but was only one against interest and that consequently a preliminary examination by the court was unnecessary. The defendant contended that the People had at all times treated the statement as a confession and should not be allowed to say it was merely exculpatory. The trial court ruled that the statement was not a confession, dispensed with the preliminary hearing and admitted it in evidence before the jury as an incriminating or exculpatory admission.

The general rule is that a confession is a voluntary acknowledgment of guilt after the perpetration of the offense, and that it does not embrace mere statements or declarations of independent facts from which guilt may be inferred. (1 R. C. L. 472, 550; 16 Corpus Juris, 715.) This court has held that a confession is a voluntary declaration of guilt of a person charged with a crime of his agency or participation therein, and that "it is not equivalent to statements, declarations or admissions of facts criminating in their nature or tending to prove guilt. It is limited in its meaning to the criminal act." (*Michaels* v. *People,* 208 Ill. 603; *People* v. *Stapleton,* 300 id. 471; *People* v. *Kircher,* 309 id. 500; *People* v. *Arthur,* 314 id. 296; *People* v. *Rupert,* 316 id. 38.) In *People* v. *Okopske,* 321 Ill. 32, we said: "A confession implies that the matter confessed constitutes a crime. An acknowledgment of facts merely tending to establish guilt is not a confession

but only an incriminating admission, which may be made without any intention to confess guilt. * * * An exculpatory statement denying guilt cannot be a confession.—Wigmore on Evidence, (2d ed.) sec. 821." Exculpatory statements do not require proof of their voluntary origin, hence a preliminary examination is unnecessary. (*People v. Gibbs*, 349 Ill. 83.) We are supported in our view by the Massachusetts cases of *Commonwealth* v. *Piper*, 120 Mass. 185, and *Commonwealth* v. *Dascalakis*, 243 id. 519, 137 N. E. 879, 38 A. L. R. 113. In the latter case it was said: "The rule which excludes a confession of guilt by a defendant which he was induced to make through fear of personal injury or hope of personal benefit is not applicable to the declaration by a defendant not in the nature of a confession, although the declaration might tend, in connection with other circumstances, to prove his guilt."

Under the law of this State as announced repeatedly by this court it seems evident that the third statement of the defendant was not a confession. She did not admit in that statement, or in the two previous ones, that she was guilty of the crime charged. None of the three statements, when considered alone and without relation to other evidentiary facts brought out at the trial, contain any admissions of guilt. The inferences of guilt which may be drawn from each statement, considered separately, are meagre. However, when we consider the three statements in their relation to each other and also in relation to the defense of alibi we find them to be very damaging to the defendant. Their injurious effect is intensified when they are studied in the light of facts adduced by the People at the trial. That these statements, so considered, are hurtful to the cause of the defendant is no warrant for their treatment as a confession. No error was committed by the trial court in allowing the introduction of the third statement in evidence without first conducting a preliminary examination to ascertain whether it was the free and

voluntary expression of the defendant, made without the persuasive influence of hope or fear.

Certain objections are made to the form and manner of instructing the jury. It is first charged that rule 27 of this court was violated because fifteen separate instructions were given. Rule 27 provides that instructions in criminal cases shall be given in accordance with section 67 of the Civil Practice act. That section requires the jury to be instructed in the law applicable to the case by a connected and continuous narrative and not by separate instructions. An examination of the instructions given in the present case shows that the trial judge made a studious effort to comply with this new procedure and attained a creditable result. It is true that each instruction was given a serial number by the trial judge—an unnecessary act under the new rule. But aside from this we are unable to see any infraction of the rule, as the instructions are otherwise in the form of a connected and continuous narrative. There is a noticeably smooth and logical transition from the statement of one rule of law to the succeeding one and all are couched in language easily comprehended by laymen. The objection is only to the form and not to the substance of the instructions, and while it was unnecessary for each instruction to be numbered, no harm has resulted or could result to the defendant by this error.

One part of the instruction stated that "malice aforethought" does not necessarily imply lapse of considerable time between the formation of the intent and its actual execution; that it is immaterial whether the design to effect the death was instantaneous or might have been in the defendant's mind for some time, and that malicious killing is homicide under the law. The defendant calls this a feeble revision of an instruction condemned in *Marzen* v. *People*, 173 Ill. 43. The instruction in that case told the jury that malice aforethought did not necessarily imply deliberation. We there held that malice is always presumed

where one person deliberately injures another, and that it is the deliberation with which the act is performed which gives it character as contrasted with an act performed in uncontrollable passion. The fault of the instruction condemned in the *Marzen case*—*i. e.*, all reference to "deliberation"—was omitted in the instruction here, and, as it was applicable to the facts of the case, no error was committed in giving it.

The instruction of circumstantial evidence was as follows:

"Circumstantial evidence in criminal cases is the proof of such facts and circumstances connected with or surrounding the commission of the crime charged tending to show the guilt or innocence of the party charged. Circumstantial evidence is legal evidence and must be considered by you."

The defendant now complains of the failure of the court to instruct the jury on the weight to be given to circumstantial evidence or the manner of receiving it. In addition to the above quoted sentences relating to circumstantial evidence, the instructions given contained an ample presentment of the rules of law on the presumption of innocence, reasonable doubt, burden of proof, amount of testimony necessary to convict, and that the indictment and the arguments of attorneys were not evidence. The court did not instruct the jury upon circumstantial evidence alone, but told them that a conviction must be predicated upon proof by competent evidence, beyond a reasonable doubt, of every element of the crime charged. The jurors were also told that all facts and circumstances used to sustain the charge must be consistent with the defendant's guilt and inconsistent with every reasonable hypothesis or conclusion of her innocence. The degree of certainty required for a conviction upon circumstantial evidence is the same as is prescribed for a conviction on direct evidence. There is no legal distinction between the two as to their weight

and effect. (*People* v. *Buskievich*, 330 Ill. 532.) We cannot see where the defendant has been prejudiced by the failure of the court to deliver a lengthy exposition of the rules of law pertaining to the reception of circumstantial evidence by the jury.

The defendant claims to have interposed and proved an alibi defense, and reversible error is alleged because the trial court refused to give an instruction on such defense and its proof. To the contrary, the People say that the defendant failed to establish an alibi, and therefore the court was under no obligation to give such an instruction. In support of her contention the defendant has cited a line of cases from Ohio, West Virginia, New Jersey and Connecticut to the general effect that an alibi need not be established beyond a reasonable doubt but that it is the duty of the trial court to instruct on the law of alibi where there is substantial evidence in support of that defense. (*Burns* v. *State*, 75 Ohio St. 407; *State* v. *Friend*, 100 W. Va. 180; *State* v. *DeGeralmo*, 83 N. J. L. 135; *State* v. *Brauneis*, 84 Conn. 222.) These authorities, however, are not in accord with the rules heretofore laid down for such a defense in Illinois. In fact, it has been held reversible error to give an instruction in this State on alibi where no such defense was made by the defendant. In *People* v. *Lukoszus*, 242 Ill. 101, Justice Cartwright, speaking for the court, reversed the case upon the ground, among others, that the trial court gave an instruction as to alibi when there was, in fact, no evidence of alibi introduced. The same result followed in *People* v. *Arthur, supra.* The object of instructions is to give the jury the rules of law applicable to the evidence of each particular case, so that the jury may apply such rules to the facts. By this token it is error to give an instruction if it is liable, under the facts, to mislead the jury. *People* v. *Forte*, 269 Ill. 505.

The propriety of an instruction on alibi has been considered many times by this court. We believe that the

prevailing rule was announced in *Briggs* v. *People*, 219 Ill. 330, and re-affirmed more recently in *People* v. *Schladweiler*, 315 id. 553. In the *Briggs case* it was said: "We think an instruction defining the defense of alibi would be sufficient and proper if it simply stated, to render the defense of alibi available the proof must cover the whole of the time of the commission of the crime, so as to render it impossible, or highly improbable, that the defendant could have committed the act." In fuller exposition of the subject we said in the *Schladweiler case:* "The whole purpose and force of an alibi is to show that the defendant could not have committed the crime or that it was highly improbable that he could have done so, for the one reason that he was somewhere else at that time. The reasonable doubt as to the guilt of the defendant arising out of evidence of a defense of alibi must come from the fact that the evidence tends to show the impossibility, or the improbability, of the presence of the defendant at the time of the commission of the crime. If the evidence as to alibi, though taken to be true, does not cover sufficient of the time at or before the crime to render the presence of the defendant impossible or highly improbable, then it proves nothing and is of no avail to him, as where A is charged with a murder committed between the hours of 8:00 and 11:00 o'clock in the evening and he offers proof that he was at the home of the witness, one mile from the scene of the crime, between the hours of 4:00 and 6:00 o'clock on that evening. Such testimony does not constitute an alibi, for the evidence, though true, does not tend to prove that it was impossible, or highly improbable, that he could have been at the scene of the crime when it was committed, and such evidence does not render the defense of alibi available to him."

In order to determine whether the evidence at the trial was sufficient to establish an alibi defense we must examine the testimony with reference to the defendant's

whereabouts during the afternoon or evening on which the crime was committed. Such examination reveals the following: The defendant testified that she left her house at 3:10 or 3:15 in the afternoon and that the deceased was there when she left. The defendant did not return home until about 5:00 o'clock. John Brennock, a messenger boy, testified that he endeavored to deliver a telegram at the house at 4:30 P. M. but could arouse no one, although he saw a light on the first floor and in the basement. Enid Hennessey, the school teacher who roomed with the defendant, entered the house shortly after 6:00 P. M. and found the defendant at home. The defendant's statement that she was out of the house from 3:10 until 5:00 o'clock was corroborated by a Mr. Cleveland, an old friend, who said he met her at the Garfield Park Hospital at about 4:15 that afternoon. During her two-hour absence from the house the defendant said she had stopped at a postal station and purchased 260 one-cent stamps. From the postal station she said she went to a hardware store conducted by Edward Newman at about 4:00 o'clock and inquired for him but he was not in. The stamps were introduced in evidence, but there was no evidence other than defendant's testimony that she had purchased the stamps at the place and at the time testified to by her, nor was any person from the Newman store produced to substantiate her presence there on the afternoon in question. Miss Hennessey ate her evening meal with the defendant, then, at the defendant's request, went to a drug store and returned to the house at about 7:15 or 7:30. Veronica Duncan, a next door neighbor, testified that about noon on November 21 she received a telephone call from the defendant asking her to step out on the front porch, about three feet distant from the Wynekoop porch. She complied, and the defendant came out on her porch and asked Veronica what she was doing that afternoon. The witness said she might take a walk and suggested that Rheta go along. The de-

fendant said that Rheta was busy in the house, and that as the defendant was planning to go down-town that afternoon, Rheta would be unable to go in her absence. Later that day Veronica said she saw Rheta on the street carrying some groceries and that she seemed to be in a hurry but that the witness noticed nothing unusual about her. Veronica fixed the time when she met Rheta at about, or probably before, 3:00 o'clock in the afternoon. Ahern, the undertaker, stated that he received a call from defendant at 9:35 P. M. on November 21 and arrived at the Wynekoop house about ten minutes later. At the time the body was removed to his undertaking establishment by the police he said he examined it and found very little heat in the body and that *rigor mortis* had set in completely. This was at 11:15 P. M. He testified that *rigor mortis* results in from three to ten hours after death.

From this evidence it is apparent that from 5:00 o'clock until shortly after 6:00 o'clock on the evening of the crime, and again from approximately 6:45 until 7:15 or 7:30 while Miss Hennessey was away at the drug store, the defendant has failed to establish her absence from the scene of the crime. She has admitted that she was at home, and has not attempted to prove that she was elsewhere, all afternoon and evening except for the time between 3:10 and 5:00 o'clock P. M. The school teacher roomer was not at her house that afternoon until shortly after 6:00 o'clock and left again for a half or three-quarters of an hour after the evening meal. By her own testimony the defendant admits being alone with Rheta for a total of one hour and fifty-five minutes between the hours of 3:00 o'clock that afternoon and 8:30 that night. As the crime is shown to have been committed some time during the five and one-half hour period between 3:00 o'clock in the afternoon and 8:30 that evening, the failure of the defendant to offer any alibi proof during the three periods of time aggregating nearly two hours is fatal. This failure to offer any

alibi evidence to cover such a material portion of the time made the defense of alibi of no avail to the defendant and the instructions on that subject were properly refused by the trial court.

During the progress of the trial the court excused the jury before the defendant was wheeled in to take the witness stand and before she was removed therefrom in a wheel chair. She now asserts that this was prejudicial to her right to have the jury view her infirmities. We have examined the record with reference to this complaint and also with reference to some of the remarks of the State's attorney which are alleged to have been highly prejudicial, but can find in none of these matters anything to show that the defendant's rights have been impaired or that she has been denied a fair or impartial trial. The remarks of the prosecutor that the State had lost money because "the defendant pulled a fake in the last trial" were objected to, and the objection was properly sustained by the trial court and the remarks ordered stricken from the record. This statement was provoked by a previous improper remark by counsel for defendant after the trial judge had ruled against one of his objections. The incident was promptly disposed of by the trial judge and had no direct bearing on the guilt or innocence of the accused.

A review of all the evidence causes us to refrain from disturbing the verdict of the jury. Aside from the unhappy financial and domestic conditions which might have motivated the crime, and the failure to establish an alibi, the defense that the premises had been broken into is not supported by any evidence. An inspection by the police immediately after their arrival showed that all the doors and windows were locked, with no indications of any forcible entry. Neither did the police records show any reports of previous crimes or the breaking and entering of the defendant's premises, as she alleged. We have repeatedly held that we will not disturb a verdict of guilty or reverse

a judgment of conviction unless the verdict is palpably contrary to the weight of the evidence or unless the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. (*People* v. *Buskievich, supra,* and cases cited.) In this case the verdict is not palpably contrary to the weight of the evidence nor is the evidence of such character as to justify a reasonable doubt of the defendant's guilt.

The judgment of the criminal court of Cook county is therefore affirmed.  *Judgment affirmed.*