51 N.J. Super. 218 (1958)
143 A.2d 833
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JAMES BUFFA AND PHILIP CAREY, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Considered May 12, 1958.
Decided July 3, 1958.
*220 Before Judges GOLDMANN, FREUND and CONFORD.
*221 Messrs. James Buffa and Philip Carey, pro se.
Mr. Charles S. Joelson, Deputy Attorney-General and Acting Passaic County Prosecutor, attorney for respondent (Mr. Archibald Kreiger, Deputy Attorney-General, on the brief).
The opinion of the court was delivered by FREUND, J.A.D.
The defendants appeal from convictions of armed robbery in violation of N.J.S. 2A:141-1 and 2A:151-5.
On Friday, October 26, 1956, at about 7:45 P.M., two office employees of the Continental Baking Company in Paterson, N.J., Mrs. Georgianna Rippey and Mrs. Florence Borst (since deceased), were about to leave their work when, in a narrow hallway adjacent to a room which contained two company safes, two men, with handkerchief bandannas covering most of their faces and hats pulled down over their ears, accosted them and forced them back into the room. At the time four other employees who had remained at their desks were in the same room. They were Mrs. Ethel Reilly, Mrs. Mary Knerr, Mrs. Adelaide Scherer, and Mr. Joe Stewart Miller. At first some of the witnesses believed the episode to be a Halloween prank committed by some of the company workers. However, it soon became evident that a robbery was taking place. The bandits, described as tall and short, proceeded systematically to tie with rope each of the workers in the room, and induced one of them, Mrs. Knerr, to open a closed safe. The shorter of the bandits brandished a revolver, testified to be a 38 caliber revolver. They took about $1,500 out of the safe and made good their escape.
Subsequently the defendants, James Buffa and Philip Carey, were apprehended, indicted, and convicted for the commission of the crime. They appeal to review the legality of their convictions.
The principal issue in the trial was that of the identification of the perpetrators of the robbery. The defense was that of an alibi on behalf of both of the accused men. The following is a summary of the testimony as it bore on these *222 issues. Mrs. Georgianna Rippey, one of the women stopped in the hall by the bandits, when asked if she observed what went on after being ordered back into the room, said she was dazed and was unable to give much information. Although she was only three to five feet away from the men, she could not tell what color handkerchiefs they wore, but said that the smaller of the two men had a weapon. The taller man (later identified as the defendant James Buffa by other witnesses) tied her to a chair. She was unable to identify the men who committed the crime. She estimated that the entire episode lasted until approximately 8:45 P.M., although she was not sure.
Joe Stewart Miller, the only male employee working at the time of the robbery, testified that he was sitting at his desk working when the episode commenced. He described the manner in which Mrs. Rippey and Mrs. Borst were pushed back into the room. He stated that he was tied with the others and propped up against a desk. He described the dress of the bandits as follows:
"* * * they both had hats that pulled down close over their heads; close down over their ears. I thought it was what is commonly referred to as [a] Fedora type hat. They had bandannas across their faces on top of the bridges of their nose."
The handkerchiefs were dirty white, almost gray. He identified the two defendants, James Buffa and Philip Carey, in the courtroom as being the men who committed the crime. He noticed at the trial that Buffa did not look then (at the time of the robbery) as he looked now  "he had dark bushy hair, thick hair, which at the present time he doesn't have." He stated that the day following the robbery he was at police headquarters and was shown a series of photographs from which he picked out two, being photographs of Buffa and Carey, as the perpetrators of the crime. He learned the names from the reverse sides of the photographs after having selected them. On cross-examination he stated that at the time of the robbery he did not see the chin, mouth, lower part of the nose or the upper part of the ears because of the covering *223 hats and handkerchiefs, but reiterated his identification of the photograph of Buffa. He resisted defense attempts to shake his identification of Buffa's photograph by insisting that it was his own free choice without suggestion by two detectives. When asked again whether he was positive that he had seen Buffa in the office on October 26, his answer was, "All I can say is that I thought it was him. I can't be positive. But I thought that was him." On cross-examination he answered similarly in identifying Carey. He stated that he picked Carey's photograph from among those shown to him the next morning at the detective bureau, although he testified that he had only "approximately three, maybe four inches" of face available for observation. At one point in his testimony he placed a hat and handkerchief (not the ones used in the robbery) on both of the defendants as he remembered them to be on the night in question, for the benefit of the jury.
On re-direct examination, Miller described the tall desperado as having "dark bushy eyebrows and deep inside eyes, long with dark hair." The small one "had squinty, a squinty expression on his face with a sort of twinkle in his eyes. I just could not forget that twinkle in his eye." Miller did not testify that either of the bandits had any garlic odor about him, a fact whose significance will become apparent.
Mrs. Ethel Reilly, another of the workers, testified that at one time while one of the robbers, described as the tall one, was in the process of tying up other workers, she got a good look at him when his bandanna slipped and she "got a glimpse of his face." He quickly "put it up." This was the same man who tied Mrs. Reilly and was therefore in close proximity to her, and she smelled a garlic odor. "In fact, the whole office smelled of garlic * * *." She did not state that the other (smaller) man had the garlic odor. She further testified that the morning after the robbery the police brought 50 or 60 photographs to the Continental Baking Company office where they requested her, sitting alone at her desk without any interference from other persons, to try to identify the men who perpetrated the robbery. She picked *224 the photographs of Buffa and Carey as being the two involved in the crime.
On the Tuesday after the robbery she was present at a police line-up where out of eight men she picked the defendant Buffa as being one of the bandits, and said she was positive of this identification. She told the police at the time of the line-up that Buffa "looked different because he has had that bushy hair clipped very close."
Upon cross-examination, she stated that she did not get a glimpse of Carey's face, "but I got a glimpse of his eyes. * * * I got a good look at his eyes."
Mrs. Mary N. Knerr, another of the employees present at the time of the robbery, testified that she was shown a "big pile" of photographs, "about 50 or 60," at police headquarters the day following the robbery. At the trial she identified Carey from one of the group of photographs shown to her. She testified that she picked out Buffa's and Carey's photographs, the same photographs identified by Mrs. Reilly, but she did not attend the police line-up on Tuesday following the holdup. Nor did she see the handkerchief drop from the tall bandit's face. Her identification of Carey's photograph was from the "general appearance of this man."
The last eye witness, Mrs. Adelaide Scherer, testified that the taller of the two men had a "very strong odor of garlic on him" which she noticed because he was close to her. She also stated that she was shown a number of photographs in the office and set aside one of them as being Buffa. She pointed out Buffa who was in the court room in front of her. She had independently picked Buffa from the police line-up based upon his height, eyes, hair and shoes, which made her "positive that [he] was the man." On cross-examination she stated that her identification of the photographs was her own choice and not the result of consultation with co-workers. She had no difficulty in identifying Buffa at the line-up, iterating that it was because of the color of his eyes, bushy hair, and his shoes. She did not, however, see Buffa's handkerchief slip, as testified to by Mrs. Reilly.
*225 Detective Edward Callahan was assigned on the following day to investigate the robbery. His testimony substantiated the other witnesses as to identification of the defendants' photographs. He apprehended Buffa at his girl friend's house on Monday night following the robbery. He stated that Mrs. Reilly and Mrs. Scherer the next day, in two separate line-ups, both chose the defendant Buffa as being one of the holdup men. He described the line-up, and said that eight men were used, all having the same general build and appearance as Buffa. Buffa was placed in a different position for each line-up and the identifying witnesses were kept separate. He also testified that he arranged for the photograph identification by the witnesses at the Continental Baking Company and at police headquarters.
He asked Buffa if he would give a statement as to his activities the night of the holdup, but when the statement was prepared Buffa refused to sign it until he had counsel. When the unsigned statement was offered in evidence, objection was made to its admission, upon the ground that it was not a voluntary statement. Then followed, in the presence of the jury, testimony as to the detention of Buffa prior to securing the statement. The unsigned statement recites that it was taken at 3:43 P.M. on October 31, 1956, and describes Buffa's activities on the preceding Thursday, Friday and Saturday.
In discussing the circumstances of Buffa's detention Callahan stated that Buffa was first arraigned on Tuesday morning at which time the police asked for an additional 24-hour period for further investigation, which was granted. He stated that Buffa was fed, and slept in a detention cell, and later was transferred to the county jail. He was questioned for about 20 or 30 hours, but no more than "two or three hours at best at any one time * * *." Callahan was not present at all times during this interrogation, but was there only intermittently inasmuch as he was attempting to apprehend Carey. With regard to the actual solicitation of the statement, Callahan testified that Buffa voluntarily gave the statement, without threat or promise, to a police *226 typist in the presence of Detective Baines and himself, as well as others. A copy of the statement was given to Buffa to read, but he refused to sign it. He did, however, acknowledge the truth of the statement.
Upon this testimony the trial judge admitted the statement into evidence. In it Buffa did not admit any complicity in the crime for which he had been arrested. However, the statement is important because of the information included in the details of his activities on the Friday of the crime. After reciting that he spent the afternoon in Totowa, N.J., with his mother and father, two sons, and his friend Carey, the co-defendant, where he "picked up some fig trees" from a lot owned by the Buffas, he stated that he returned to his home at about 4:30 P.M., then "[w]e ate supper at about 5 P.M., we had spaghetti and garlic sauce. I wasn't feeling too good so I laid down, I got up about 9:45 P.M. and Phil said to me let's go up to my uncle's house on Summer St. and 21st Ave. as he wanted to borrow some money from Paul Black his uncle." The entire statement was read to the jury and they were carefully instructed that it was not binding on the defendant Carey.
Detective Baines stated that the defendant Buffa was present when the witnesses gave their statements concerning the events of the night, but these witnesses were not present when Buffa gave his voluntary statement. After Buffa's arrest on Monday night, he was arraigned on October 31 (Wednesday) at 9:52 A.M., but a 24-hour extension was given. He was re-arraigned the following day. The statement was purportedly given on Wednesday afternoon. Baines also described the line-up at which Buffa was picked out as a "very perfect line-up."
Carey was apprehended by the police on February 2, 1957 and until that time, according to the witness, the police did not know of his whereabouts.
At the conclusion of the State's case, motions for acquittal were made and denied.
The defendant Buffa testified in his own behalf. He specifically denied he was engaged in the hold-up at the *227 Continental Bakery. He stated that he did not have spaghetti and garlic sauce on Friday night but rather said, "I had spaghetti with sauce and I had some fried potatoes." He testified that on the Friday night of the crime he finished his supper about 6:30 and watched television with his children. Philip Carey, who had a room in the Buffa household but who also had a mother and an aunt living in Paterson, ate dinner with the Buffas. Carey left after supper and Buffa stated that he did not know where Carey went. He further stated that he left his house between 8:45 and 9 o'clock to visit his girl friend. He left his girl friend at about 10 P.M. and returned home where he met Carey. The two of them went to a neighborhood tavern and had a glass of beer. He returned home between 11:30 and 12 and went to bed.
He further said that he was arrested on Monday at midnight and was questioned most of that night and the next day (Tuesday) but that he did not give a statement to Detective Callahan. He did, however, state that the statement purportedly made by him, which was received in evidence as part of the State's case, was presented to him for his signature but he refused to sign it because "* * * a couple of lines that seems that were in there weren't true, that I didn't say."
Buffa's counsel brought out that he had previously been convicted of two crimes and that as a juvenile he was in Bordentown (reformatory). He claimed that at the line-ups one of the witnesses was not able to pick him out as being the person involved and that Callahan coached the witness by asking her, "Is he the one with the maroon jacket?" He described at length his detention from the time of his arrest until the time of his arraignment on Thursday, saying that he had but four hours of sleep in a detention cell on an iron bed without a mattress, and further, that he was given only one hamburger and one cup of coffee to eat.
Buffa was cross-examined extensively as to the authenticity of his statement allegedly given to the police. Although he admitted a part of it, he vehemently denied the crucial parts *228 of the statement with reference to the spaghetti garlic sauce and his activities after dinner on the night of the holdup. He stated specifically that the reason that he would not sign the statement was because the sentence with regard to the garlic sauce was not his own but that of his interrogator who suggested the answer. He also said that he had no opportunity to go over the statement.
On further cross-examination, the prosecutor established that Buffa had been previously convicted of other crimes. He was specifically asked whether he was convicted of rape, and he answered in the affirmative. However, the question arose as to the age of the defendant at the time of this conviction. The facts indicate he was convicted on May 16, 1945 and sentenced on August 24, 1945. Since he was born on September 16, 1928, he was 16 years old at that time. The prosecutor also brought out that he was convicted for grand larceny and sentenced on February 8, 1946. An issue arose concerning the admissibility of this evidence since it related to whether this was a juvenile conviction and therefore inadmissible to impeach. The trial judge sustained the objection temporarily until it could be ascertained at what date the statute (N.J.S. 2A:4-39) had been amended. At this point the trial was recessed for four days because of other commitments of the trial judge. Upon convening for the continuance of the trial, Buffa established that he was not convicted of rape in 1945, but rather for fornication with a girl 24 years of age. No objection, however, had been made previously when it was indicated to the jury that the conviction had been one for rape. The indictment for fornication was received in evidence.
Jennie Buffa, the defendant's mother, testified with the aid of an interpreter. She corroborated Buffa's story that he did not leave the house until 9 P.M. on October 26, 1956. She testified that the family had spaghetti and fried potatoes for supper that night and that she did not use garlic but rather used onions. She could not use garlic because "it hurts me. I am sick."
*229 Philip Carey, the defendant, also testified that he had supper with the Buffas on October 26 and had spaghetti and fried potatoes. He said there was no garlic sauce. He left the house at about 6 P.M. and went to his aunt's house on Summer Street. She was not home but had left a note that she would stop at Hatfield's Tavern. He took a bus and met her at the tavern and stayed about two hours. He could not remember anybody who was there. He was at the bar for a while and then sat at a table listening to his aunt who was playing the piano. He left the tavern with his aunt and stayed at her house for 10 minutes and then returned to the Buffas' house between 9:15 and 9:30. About 20 or 25 minutes later Buffa came in and the two went to Doc's Tavern. They returned home at about 12 midnight.
He corroborated testimony given by Buffa and Buffa's mother that he was present at the arraignments and that he attempted to secure legal advice for Buffa while he was being detained. He testified that on Saturday (November 3, 1956) he left for Southern Pines, North Carolina, where he worked, returning to Paterson on December 26 or 27. He stayed at his aunt's house for a while and then in the early part of January lived in Newark where he was attempting to go into business. He was arrested on February 2 while at a bar in Paterson.
On cross-examination Carey displayed a vague memory of the events of October 26, although he did testify rather explicitly as to how he spent the evening with his aunt. The prosecutor again elicited from him, as had his own attorney, that he (Carey) had a record of four convictions.
Mrs. Betty P. Pohlman, Carey's aunt, testified substantially to the same facts concerning his alibi as stated by Carey. She said that on Friday, October 26, 1956, at about 6 P.M. she went to Donnelly's Tavern, formerly known as Hatfield's, and that "Phil" came in about ten minutes to seven. They stayed until 8:30 (she happened to look at the clock). During her sojourn at the tavern she played the piano for a patron named McDermott. She and Carey then left for her house. During the interval of time after the robbery *230 until his arrest, she testified, she was never contacted by the police relative to Carey's whereabouts, and further that on one occasion, at Carey's request, she wired him about $273.
Cornelius McDermott, the vocalist for whom Mrs. Pohlman played the piano, testified in corroboration of her story. Significantly, however, no questions were asked of him concerning whether he recognized the defendant Carey as being one of those present on that evening.
Detective Baines, in rebuttal, testified that no one "laid a hand" on Buffa and he denied that he "nudged" one of the identifying witnesses at the line-up concerning which of the participants was the suspected robber. He also testified that Carey was confronted by three of the witnesses after his arrest on February 4 but not in a police line-up. A handkerchief was placed over his face and a hat put on and they looked at the defendant and said, "He looked very much like the man."
Lastly, Buffa's girl friend, Maria Engushowa, testified that although Buffa usually showed up on Friday evenings, when he did not come until after 9 P.M. she asked him where he was and he answered that his mother and sister were sick.
During the course of the trial, a previously excused member of the jury panel, not a member of the jury trying the instant case, inadvertently entered the jury room but was swiftly removed. The jury had not yet received the case for its deliberation. This incident is one of the grounds of appeal and we reserve the factual presentation thereof until our consideration of the law.
Although this appeal is prosecuted by the defendants jointly, two of the grounds of appeal relate to Buffa individually. He argues that the admission into evidence of the statement allegedly made by him constitutes prejudicial error.
Initially, it should be noted that the statement in issue is not truly a confession of the crime charged, but rather is an admission of a subsidiary fact, important circumstantially in connection with the explicit testimony of Mrs. Scherer and Mrs. Reilly concerning the garlic odor on the *231 tall bandit (Buffa). It has been characterized as "a little brother of a confession." McCormick, Evidence (1954), § 113, p. 234.
The State in response to Buffa's argument in part suggests that an admission is not subject to the same requirements concerning voluntariness as a confession. There is substantial authority for this contention. Delnegro v. State, 198 Md. 80, 81 A.2d 241, 245 (Ct. App. 1951); State v. Romo, 66 Ariz. 174, 185 P.2d 757 (Sup. Ct. 1947); People v. Wynekoop, 359 Ill. 124, 194 N.E. 276 (Sup. Ct. 1934); Commonwealth v. Dascalakis, 243 Mass. 519, 137 N.E. 879, 38 A.L.R. 113 (Sup. Jud. Ct. 1923); 3 Wigmore, Evidence (3d ed. 1940), § 821, p. 243, n. 4. The contrary view, circumscribed with safeguards of admissibility, as in the case of any confession, is clearly indicative of a more just result, and in keeping with present trends for fair play and justice in criminal prosecutions. Ashcraft v. State of Tennessee, 327 U.S. 274, 66 Sup. Ct. 544, 90 L.Ed. 667 (1946), but see Stein v. People of State of New York, 346 U.S. 156, 163, note 5, 73 S.Ct. 1077, 1082, 97 L.Ed. 1522 (1953); Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1943); People v. Hiller, 2 Ill.2d 323, 118 N.E.2d 11 (Sup. Ct. 1954)  without discussing People v. Wynekoop, supra; State v. Nagle, 25 R.I. 105, 54 A. 1063 (Sup. Ct. 1903); McCormick, op. cit. supra, § 113, p. 236, nn. 11, 12; 20 Am. Jur., Evidence, § 478, p. 418, n. 9; A.L.L., Model Code of Evidence, Rule 505, p. 239.
But, because the trial judge in the case sub judice ruled that the statement was voluntary and in effect treated it as a confession, we need not decide whether an admission of a subsidiary fact must be voluntarily given. We leave the question open. State v. Donato, 106 N.J.L. 397, 405 (E. & A. 1929), and State v. Lustberg, 11 N.J. Misc. 51, 55 (Sup. Ct. 1933), although touching upon the problem, do not discuss it.
We approach the issue, then, on the assumption that the statement had to be voluntary to be admissible. The *232 fact that it might have been obtained after an undue detention prior to being brought before a magistrate, contrary to R.R. 3:2-3, does not per se make it inadmissible. State v. Pierce, 4 N.J. 252, 258 (1950); State v. Cooper, 10 N.J. 532, 550-552 (1952). This is contrary to the federal exclusionary rule. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). The admissibility must turn upon whether the statement was voluntarily and freely made. In this regard, the determination of the trial judge, supported as it is by substantial evidence, is determinative of the question of whether it was voluntarily made within the purview of the legal implications of that conclusion. It was his determination to make, 3 Wigmore, op. cit., supra, § 861, p. 345, and we are not disposed to reverse his ruling. State v. Cole, 136 N.J.L. 606 (E. & A. 1948); State v. Pierce, supra, 4 N.J. at page 258. Whatever contradiction exists by reference to Buffa's testimony given after the statement was received, is available only for purposes of establishing the weight that the jury is to give in considering its import.
Buffa also argues that the jury should have been excluded during the receipt of evidence by the trial judge concerning the question of whether the statement was voluntarily given. This course of action by the trial judge is a matter for his discretion and the exercise of that discretion will not result in reversal unless it is shown that there was an abuse of discretion resulting in a manifest wrong to the defendant. State v. Fiumara, 110 N.J.L. 164, 168-170 (E. & A. 1932); State v. Huff, 14 N.J. 240, 249 (1954). Our examination of the testimony does not show that the defendant was in any way prejudiced by having the jury present during the course of the trial judge's investigation of the pertinent facts.
But since the trial judge ruled that the statement was admissible and there was sufficient evidence to support his determination, State v. Pierce, supra; State v. Cooper, supra, it was substantive evidence of the activities described therein, *233 including the inculpating fact that Buffa's dinner consisted of, among other things, a garlic-seasoned food.
Buffa argues that the prosecutor improperly confronted him on cross-examination with convictions of offenses as a juvenile. It should be noted first that defendant undertook on direct examination to show that he had been sent to Bordentown as a juvenile and had been twice convicted of crime. This would amount to a waiver of objection to cross-examination as to juvenile offenses if designed to show there was more than one such offense or more than two convictions of crime. Certainly the State is not compelled to stand by helplessly when a defendant misrepresents the number or character of his prior convictions. But cf. State v. Wolak (26 N.J. 464, at page 483).
Moreover, the offenses in question were committed in 1945 and 1946. At that time, by reason of L. 1918, c. 86, juvenile offenses were limited to those committed by persons under 16. Subsequently by reason of L. 1946, c. 77, enacted on April 12, 1946, the age was raised to 18. This law is now embodied in N.J.S. 2A:4-39. If the law at the time of the conviction permitted conviction as an adult of persons between 16 and 18 at the time of commission of the offense, the defendant cannot complain merely because the law later raised the age of juvenile offenses to 18. The defendant became 16 on September 16, 1944 and 18 on September 16, 1946. The record before us does not, however, fix the date of commission of the offenses for which the defendant was convicted. He has therefore failed to show that any of the convictions used against him was improper on the basis both that it was committed when he was under 18 and that at that time the law precluded conviction as an adult of a person of his age at the time. It follows, therefore, that the trial judge in allowing this evidence to be used for purposes of impeachment did not commit error.
We note that the prosecutor stated before the jury that one of those prior convictions was for rape when in fact it was for the lesser crime of fornication. Objection was not made on this ground, however, and therefore the only relief *234 available to Buffa would be within the contemplation of our plain error rule. R.R. 1:5-1(a); State v. Bucanis, 26 N.J. 45, 54 (1958). In view of the fact that after the four-day recess the true character of the offense was made known to the jury by defendant's counsel and again during the course of the summation, we perceive no plain error.
The defendants state as another ground of appeal that the trial court erred in denying their motion for acquittal. The rule is well settled that on such a motion, the trial judge should deny it where there is any legal evidence before the jury from which an inference of guilt could legitimately be drawn. State v. Cerce, 22 N.J. 236, 246 (1956); State v. Kollarik, 22 N.J. 558, 564 (1956).
In the instant case there was evidence before the court which would justify the necessary inferences to warrant its denial of the motion. The witnesses Miller, Reilly and Scherer all made identification of the defendant Buffa as being the "tall" participant in the robbery. Miller relied on his "dark bushy eyebrows and deep inside eyes," and picked Buffa's photograph out of the series presented to him the day after the robbery, and further identified him in the courtroom. Witnesses Reilly and Scherer both testified to the garlic odor emanating from the person they identified as Buffa. In addition, they identified Buffa's photograph and selected him in a line-up. Mrs. Scherer relied upon the color of his eyes, his build, and his hair. She was "positive that he was the man." Mrs. Reilly testified additionally that she got a glimpse of Buffa's face when his bandanna slipped.
With regard to Carey, Mr. Miller testified that he selected Carey's photograph from those given to him by the police, relying upon the "twinkle in his eyes." Further, he identified Carey in the courtroom as being one of those involved. Mrs. Reilly also selected Carey's photograph as being that of the "shorter" or "smaller" man at the robbery, relying on the feature of his eyes. Mrs. Knerr selected Carey's photograph from those submitted to her, although she could relate her choice only to the general appearance.
*235 Together with the statement by Buffa, which was part of the State's case, that he had for supper, on the evening in question, food which contained garlic, it becomes clear that the trial judge was correct in denying the defendants' motion for judgment of acquittal insofar as this defendant was concerned. Carey's position is somewhat better. We conclude, however, that although the evidence was weaker than that against Buffa, it was sufficient to withstand the motion. We must consider the evidence as directly identifying Carey without resolving the question of its weight. If believed, it would sustain the conviction. The fact that the identification was not "positive" does not invalidate the testimony in this regard. It nevertheless creates a jury question at this point. Cf. State v. Cerce, supra (22 N.J. at page 244); Underhill's Criminal Evidence (5th ed. 1956), § 127, pp. 240-245.
The defendants argue, additionally, that the verdict was contrary to the weight of evidence and should therefore be set aside. The law to be applied in making this determination has been clearly stated in State v. Dunphy, 24 N.J. 10, 17 (1957), as follows:
"The power of an appellate tribunal to review the findings of a jury is subject to limitations. We may not interfere with the constitutional right of trial by jury by weighing the evidence and substituting our judgment for that of the jury; nor may we set aside a verdict merely because, in our opinion, we or the jury upon the same evidence might have found otherwise. As long as the verdict of the jury rests upon testimony competent to sustain the inference of guilt, such a finding is binding on this court and our review upon appeal is aimed only to correcting injustice resulting from obvious failure by the jury to perform its function. The error in the verdict must appear to us as an `inescapable conclusion.' State v. Landeros, 20 N.J. 76, 82 (1955)."
See also State v. Haines, 18 N.J. 550, 565 (1955).
The question, then, is whether from the entire factual presentation before the jury, it appears from an "inescapable conclusion" that the jury did not correctly perform its function. The factual issue of identification is, of course, the primary one to be decided.
*236 It was also for the finders of fact to pass upon the defense of alibi supported in the case of Buffa by his mother, and in the case of Carey by his aunt. That the jury may have inferred bias on the part of these corroborating witnesses is evident from their verdict. It was their province to reject the alibi testimony and accord the State's version of the events of October 26 the greater weight. The position taken by Buffa at the trial was weakened by the testimony in rebuttal of his girl friend Maria, who stated that she saw him after nine on Friday evening. She stated that he usually saw her on Friday nights, without stating the time, but inferring an earlier time than that by reason of her testimony that when she questioned Buffa about his whereabouts, he answered that his mother and sister were sick. Together with the direct testimony of the eye witnesses to the crime and the testimony concerning garlic odor brought devastatingly into focus by the receipt into evidence of the unobtrusive but inculpating admission by Buffa concerning the garlic sauce supper, we are satisfied that we should not, within the limitations upon our appellate function as outlined above, set aside the verdict against Buffa. The responsibility for determining whether guilt of the defendant has been proven beyond a reasonable doubt rests with the jury, and the weight of the evidence and the balancing of conflicting testimony must be left for their verdict.
Carey's position, however, upon this argument is more formidable. He, too, rests his defense upon lack of proper identification and alibi. With regard to the latter, the issue was singularly one for the jury in view of his relationship to his alibi witness and of McDermott's glaring failure to indicate that he had recognized Carey as being one of those present when he was in the tavern. This point was stressed by the prosecutor in summation to the jury.
Identification of Carey rested upon a slimmer reed. He was never picked from a line-up as was Buffa, but he was identified by three of the witnesses, Miller, Reilly and Knerr. Mr. Miller and Mrs. Reilly, both admitting that they saw no more than about three inches of his face, relied upon the *237 features of his eyes in independently selecting his photograph from 50 or 60 shown to them on the day following the robbery. Mrs. Knerr chose only to say that it was by reason of Carey's general appearance that she set aside his photograph.
A significant factor which the jury may well have considered in its determination is the fact that hats and handkerchiefs were placed on both defendants during the course of the trial by the witnesses to the crime, thereby giving the jury a vivid picture of exactly what opportunity the witnesses had for identifying the defendants.
From these facts, determination of the weight of the evidence was for the jury, and we do not reach an "inescapable conclusion" that the verdict was the result of mistake, partiality, prejudice or passion. R.R. 1:5-1(a). The jury was specifically instructed that the statement by Buffa was not to be used against Carey. We must assume that that instruction was heeded. Carey's testimony concerning his presence in the Paterson area for almost a week after the crime and his availability otherwise thereafter for apprehension without any action on the part of the police until about February 2 when he was finally arrested were all issues that the jury could properly reflect upon in their deliberations. The verdict against Carey must stand within the rule.
The defendants complain of the prosecutor's comments in his summation to the jury. Except in one instance, the summation was not objected to by counsel for the defendants. Therefore, it is only within the purview of the plain error rule, R.R. 1:5-1(a), that the defendants may find solace. State v. Bucanis, supra (26 N.J. at page 57). Within the rationale of Bucanis, we find the defendants' arguments without merit. Nor did the statement objected to constitute error. We think that the prosecutor's remarks were within the rule permitting "vigorous and forceful presentation of the State's case," and not such as to preclude a fair trial.
*238 Lastly, the defendants argue that they were denied a fair trial by reason of the presence of an unauthorized person in the jury room for an instant during the trial. During a noon luncheon recess, one Mrs. Rachel Flynn, a juror in another case who had previously been disqualified from the defendants' panel, was found in the jury room in the instant case. The jurors had not yet received the case for determination. This was after the four-day recess because of the trial judge's prior judicial commitments. Affidavits were submitted by all persons involved, showing that the intrusion was inadvertent and then only for a short period of time. The issue was submitted to the trial judge upon the motion for a new trial where he rejected the contention advanced that this event vitiated the trial.
A motion to set aside a verdict for alleged interference with jurors is addressed to the sound discretion of the trial judge and in the absence of a showing of prejudice, it should not be granted. The issue is said to be not whether the interference in fact resulted in influencing the jury, but whether it had capacity to influence. Jardine Estates v. Donna Brook Corp., 42 N.J. Super. 332, 340 (App. Div. 1956). Cf. State v. Auld, 2 N.J. 426, 432 (1949). The record in this case shows affirmatively that there was no possible tendency to influence the verdict and therefore it was not error for the trial judge to rule accordingly. We might also note that had this intruder been intent upon conveying her ideas to the jurors, a real opportunity to do so was provided during the four-day recess of the trial.
In reaching the result that the convictions of the defendants should be affirmed, we have not overlooked the problem (not raised by appellants) concerning the unobjected-to testimony of the eye witnesses to the robbery of their prior identifications of photographs, or the selection of Buffa at a police line-up shortly after the crime. Further, there is the related problem concerning the corroborating testimony of Detectives Callahan and Baines on the same issues. The present trend of judicial authority is to allow such testimony. Basoff v. State, 208 Md. 643, 119 A.2d 917 (Ct. App. 1956); *239 Commonwealth v. Saunders, 386 Pa. 149, 125 A.2d 442 (Sup. Ct. 1956) (rehearing denied); State v. Buschman, 325 Mo. 553, 29 S.W.2d 688, 70 A.L.R. 904 (Sup. Ct. 1930); Annotation 70 A.L.R. 910 (1931); 4 Wigmore, op. cit., supra, § 1130, p. 208. But see State v. Landeros, 20 N.J. 69, 72 (1955); State v. D'Ippolito, 22 N.J. 318, 322 (1956). Contra, People v. Jung Hing, 212 N.Y. 393, 106 N.E. 105 (Ct. App. 1914); People v. Trowbridge, 305 N.Y. 471, 113 N.E.2d 841 (Ct. App. 1953). In view of the fact that no objection to this testimony was raised by experienced trial counsel for the defendants and not raised pro se on appeal, we decline to hold this as plain error within our rules.
For these reasons the convictions are affirmed.