The People of the State of Illinois, Plaintiff-Appellee, v. Joseph Johnson, Defendant-Appellant.

Gen. No. 50,583.

First District, Fourth Division.

August 18, 1967.

Howard T. Savage, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and E. James Gildea, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE ENGLISH delivered the opinion of the court.

OFFENSES CHARGED IN THE INDICTMENT
(1) Burglary.[1]
(2) Possession of burglary tools.[2]

JUDGMENT

After a jury trial, defendant was found guilty of both charges and was given concurrent sentences of 10 to 25 years for burglary, and 1 to 2 years for possession of burglary tools.

POINTS RAISED ON APPEAL
(1) The charge of burglary was not proved beyond a reasonable doubt.
(2) There was neither evidence of burglarious intent nor evidence to connect the burglary tools to the burglary

---

[1] Ill Rev Stats 1963, c 38, § 19–1(a):

A person commits burglary when without authority he knowingly enters into, or without authority remains within a building, . . . or any part thereof, with intent to commit therein a felony or theft.

[2] Ill Rev Stats 1963, c 38, § 19–2:

Whoever possesses any key, tool, instrument, device, or any explosive, suitable for use in breaking into a building, house trailer, watercraft, aircraft, railroad car, or any depository designed for the safekeeping of property, or any part thereof, with intent to enter any such place and with intent to commit therein a felony or theft shall be imprisoned in the penitentiary from 1 to 2 years.

charged, so the State failed to prove the offense of possession of burglary tools.

(3) The court permitted inadmissible evidence to go to the jury.

(4) There was prejudicial error in the State's closing argument.

(5) The State's instruction given on circumstantial evidence was. erroneous, and it was error to refuse defendant's instruction on circumstantial evidence.

EVIDENCE

### Testimony of State Witnesses

*Mary Lund*

She was fifteen years old and resided at 1014 Dinsmore Road, Winnetka. On the evening of July 9, 1964, at approximately 11:30 p. m. she completed taking her shower prior to retiring. She stepped out of the bathroom located next to the guest room on the second floor. Just then she heard noises resembling "running down our stairs, and also like keys or change in the pocket was jingling." Her younger sister was asleep and no one else was home. From the landing, Mary looked downstairs, saw that the lights were off, and observed nothing unusual. However, as she passed her parents' bedroom on the second floor, she saw that the lights were turned on, three drawers were open in her mother's dresser, and the contents were in a state of disarray. The top drawer of her father's dresser also was open. At no time did she see the person whom she had heard go down the stairs. She called the police and they arrived right away. They found the front door and the basement door locked, but the kitchen door was open. Mary could not be sure she had locked it before she took her shower.

*George L. Krueger, Winnetka Police Officer*

At 11:41 p. m. on July 9, 1964, he responded to Mary Lund's call concerning a prowler. In an unmarked police

car he drove to the intersection of Dinsmore Road and Rosewood Avenue in about a minute and a half. There he noticed an Oldsmobile parked on the west side of Rosewood, south of Dinsmore. He called for a license check and ascertained that the license plates had been issued to a James Highland of Wilson Avenue, Chicago, for use on a Chevrolet. Officer Krueger drove past the Oldsmobile but saw no one in the car. He turned around and parked behind the Oldsmobile. It was dark at that location. He had been watching the car for about three minutes, when he saw the car light go on. He radioed for assistance and then pulled his car to the front of the Oldsmobile and saw a man standing beside it. He approached the man and asked him what he was doing there. The man replied that he was driving by when his car broke down and stalled. He identified himself by his driver's license as Joseph Johnson, 1030 Sheridan Road, Winnetka, at which address he had formerly been employed. Officer Wallace arrived just as Officer Krueger began to question Johnson. The latter told Krueger that he had recently purchased the Oldsmobile and had transferred license plates from a Chevrolet which he had bought with those plates. Johnson said that he was en route from his place of employment at 195 Maple Hill Road, Glencoe, to his home at 1322 Sedgwick in Chicago when he became lost and his car broke down. He stated he had come up Tower Road, made a turn and ended up on Rosewood. Tower and Rosewood do not intersect, however, and Tower Road is about a quarter mile from the corner of Dinsmore and Rosewood. Defendant was dressed in a black suit, white shirt, black tie, black loafers, and wore no socks. The night was warm, the streets dry, and the ground damp with dew. Defendant was arrested for "fictitious plates" and was taken to the police station where a search of his person revealed a wallet with currency in his left rear pocket

and a half dollar and pennies in his right front pocket. Officer Wallace found two Kennedy half dollars in defendant's right rear pocket. On cross-examination Officer Krueger related that defendant told him that his car had a vapor lock. The Oldsmobile was parked about a half block from the Lund home. There were no other cars in the area. As far as Krueger was able to ascertain, defendant's story about the transferred plates was true. Under the front seat of the Oldsmobile was found a pint bottle half full of vodka, a small crowbar and a bolt puller, or lock puller.

*Gordon Wallace, Winnetka Police Officer*

He answered a call to assist Officer Krueger at the corner of Rosewood and Dinsmore at about 11:41 p. m. on July 9, 1964. When he arrived, he parked his squad car and walked up to Officer Krueger and defendant. Defendant wore a black suit, a white shirt, a tie, black loafers, and no socks. His shoes were highly polished and dry. Upon hearing "something jingling," Officer Wallace searched defendant's right rear pocket and discovered two brand new Kennedy half dollars. There was nothing else in that pocket. Wallace explained that he kept the half dollars at that time because they were found in a different location from defendant's other change. He then searched under the front seat of the Oldsmobile and found at the left-hand side a pry bar and a lock puller, as well as a bottle of vodka, half empty. In the center on the front seat he found a pair of pliers. The tools and the half dollars were admitted into evidence. Wallace stated, over objection, that one of the tools resembled a cable cutter but differed from a standard cable cutter in that it had "been ground down on either side of the tongs to make the opening wider, and thinner at the point." Also over objection, Wallace stated that from his experience as a police officer, he knew that the purpose of narrowing the point of such

an instrument was so it could be "used to put on a lock, a round, tumbler type lock, and clamp down and twist the lock, pull the lock out." In this condition the tool is known as a "lock puller." Wallace asked defendant why, if his car had been causing trouble, he had not stopped at a gas station at the corner of Tower and Linden which he had passed on the way. That station was open and was about five blocks away from the Lund home. Defendant said he was not aware that there was a gas station at that corner. He said his car had broken down but he did not know what the trouble was. Defendant did not tell him that his car had developed a vapor lock.

*Edward B. Jacobs, Winnetka Police Officer*

As he was reporting for duty on July 9, 1964, at about 11:40 p. m., he was informed that a burglary was in progress at 1014 Dinsmore Road, and proceeded to that location, covering the back door from the yard. He thereafter helped Officers Krueger and Wallace take defendant to the police station. The next morning, at about 6:00 a. m., Officers Jacobs and Krueger returned to the Lund home. They searched the area on foot and discovered a jewelry box containing jewelry, necklaces and rings, a box with a necklace in it, and a razor or hair-trimmer "stacked in a pile" on the parkway by some bushes off Rosewood near Dinsmore. Just south of this location, at the driveway for the corner house, the officers discovered a transistor radio under the bushes. In the course of the search, the officers also found a pair of wet green socks near the rear door next to the driveway of that corner house (on the southeast corner of Rosewood and Dinsmore, facing Dinsmore). The wet socks were in a covered garbage can underneath some newspapers which were dry. The grass in that area was wet with dew from the night before. Opposite the driveway of the corner house, about 15 feet west of

273

the west curb line of Rosewood the officers also found a glove. The glove was later matched to another glove found underneath defendant's Oldsmobile when the car was moved the night before by another officer. The officers took the jewelry boxes, the razor and the radio to the Lund home, where Mr. and Mrs. Lund identified them as their property. The gloves and socks were not checked for ownership with anybody in the neighborhood. To get to the Lund home from defendant's automobile, you would have to walk across Rosewood Avenue and eastward.

*Clarence S. Lund*

He was the owner of the burglarized premises. On the evening of July 9, 1964, he and his wife went out to dinner, leaving his two daughters home alone. When he and his wife returned home at about 11:45 p. m., he found police cars at the house. Upon going to his bedroom, he found dresser drawers open and some things missing. He did not investigate thoroughly at that time, but noted that some jewelry was missing. On a fishing trip in Wisconsin he had obtained four Kennedy half dollars, two of which his wife had placed in a small cloth coin purse in her dresser drawer. The purse was there but the Kennedy half dollars were missing from the dresser drawer when he returned home from dinner that night. The half dollars taken from defendant and admitted into evidence were similar in appearance to those which had been in the dresser. After the police searched the premises for the burglar, they left. Officers Wallace and Jacobs returned the following morning at about 6:00 a. m. At this time Mr. and Mrs. Lund identified the jewelry boxes, jewelry, a transistor radio and a comb with razor blade as their property. All missing items were returned. The Kennedy half dollars were identifiable only by the fact that they were brand new and had not been in circulation.

### Testimony of Defendant's Witnesses

*Eddie Qualls*

He had known defendant for about four years. Defendant and eight or nine other people played a game called "Georgia Skin" at Qualls' house on July 8, 1964. Defendant won $200 or $300. Qualls told defendant that he had obtained some Kennedy half dollars at a currency exchange. Defendant purchased two of them from Qualls for $5. On cross-examination, he said he was not sure that the game was on July 8.

*Floyd Johnson*

He is a brother of defendant and was self-employed in maintenance work as a carpenter. The Oldsmobile in defendant's possession at the time of his arrest belonged to Thurman Johnson, defendant's nephew. The witness had used the car on July 8, 1964, and had placed bolt cutters, a crowbar and a screwdriver in the car at that time. He had purchased the bolt cutters to cut the bolts off a wall in a barber shop so that the mirrors in the shop might be moved. He had had the bolt cutters ground down at a hardware shop. When he was through using them he put them under the front seat of the Oldsmobile.

*Walter Bregman*

He employed defendant as chauffeur and houseman at his home in Glencoe. He had discussed with defendant the latter's tardiness to work and had suggested a time-saving route for him to take on the way to work. He advised defendant to take Sheridan Road, if Edens expressway was crowded, in order to get to work on time. He did not know that defendant had previously been employed and lived in Winnetka. Bregman's residence was located about ten minutes from Winnetka. Defendant left work between 10:15 and 10:30 p. m. on the night of July 9, 1964.

275

*Thurman Johnson*

He is a nephew of defendant. On July 8, 1964, Thurman used his Oldsmobile to assist his uncle, Floyd Johnson, in remodeling the latter's barber shop. He, Thurman, owned the Oldsmobile. He had bought it from a fellow who had it for sale with the license plates on. He did not get any plates of his own after buying the car. Defendant was driving the car when he was arrested in Winnetka. All of the tools found in the Oldsmobile at that time had been used at the barber shop on the day before. He had used the bolt cutters to pull nails out of the plaster ceiling of the shop, and when he was through, he then placed them underneath the left front seat of the car.

---

Defendant's counsel stated for the record that after a conference with his client, the defendant told him that he did not desire to testify.

After the jury's verdict, at the hearing in aggravation and mitigation, the court was advised that in 1941 defendant had been given a suspended sentence for auto theft in Mississippi; that on October 9, 1942, in Cook County, he had been given three concurrent sentences for larceny from person (1 to 10 years), assault to commit rape (1 to 14 years), and robbery (1 to 20 years); that he was released from the penitentiary in 1954, and on January 6, 1955, was sentenced, again in Cook County, to a term of 3 to 10 years for burglary.

---

OPINION

(1), (3). Defendant contends that the evidence does not establish his guilt of the burglary beyond a reasonable doubt. The State relies upon the following six separate circumstances in evidence, which it contends constitute sufficient support for the jury's verdict.

276

**Defendant's Presence at the Scene of the Burglary**

Since defendant did not testify, he accepts in his brief, the explanation which the police officer said defendant gave at the time of his arrest to explain his presence at the scene of the burglary. The essentials of that story are that he was on his way from his place of employment at 185 Maple Hill Road (near Sheridan Road) in Glencoe to his own home at 1322 Sedgwick in Chicago; that he had driven on Tower Road, Winnetka, but turned off that street; that he then became lost and his car stalled. In the light of the geography involved, and the other evidence upon which defendant relies, it would be difficult to conceive of a more ridiculous explanation.

Defendant's employer testified that he had suggested to defendant that when Edens expressway was crowded, he take Sheridan Road in order to get to work on time. He did not testify that he suggested any route by which defendant should go home after work. Nevertheless, from this testimony defendant argues that he got lost because he was following his employer's direction to take a strange route home; that this accounted for his being only ten minutes away from his employer's home almost 1½ hours after he left there to drive to Chicago. There are many things wrong with this argument. As mentioned, the employer did not tell defendant how to go home. Further, his only suggestion was for times when Edens expressway was crowded during a rush hour, and 10:15 at night is not a crowded rush hour. Defendant was not driving the suggested Sheridan Road route, anyway. From Maple Hill and Sheridan Roads in Glencoe, defendant may have followed Sheridan to Tower Road, Winnetka, but, according to his story, he was driving west on Tower Road when he turned off that street and got lost. That defendant could have gotten lost in this area is completely incredible when we bear in mind that his driver's license showed his address as 1030 Sheridan Road, Winnetka, which he described

as his previous place of employment. This address is only a block or two north of Tower Road and precisely on what defendant calls the strange new route which he claims he was unable to follow, and from which he would have been required to make a right-angle turn in order to go west on Tower.

Tower Road is one of only four or five principal thoroughfares in the Village of Winnetka and is a through street for most of its route. It is also the only street in Winnetka running directly west from Sheridan Road to Edens expressway. If defendant had decided that a quicker way home would be to go west from Sheridan road to Edens, one who had lived and worked in the area could not help knowing that route, and there would have been no reason in the world for him to have turned off on a narrow side street which would eventually have taken him to Rosewood and Dinsmore. Rosewood runs north and south but does not intersect Tower, and Dinsmore is only one short block long.

As to the supposed stalling of defendant's car, it appears that after a short conversation between the police and defendant at the time of his arrest, a policeman was able to drive the car to the police station. This and the other matters outlined above, make applicable here the sound statement of the Supreme Court that when "a defendant elects to justify or explain his presence at or near the scene of the crime, while denying participation, he must tell a reasonable story or be judged by its improbabilities." People v. Lobb, 17 Ill2d 287, 294, 161 NE2d 325.

### The Wet Socks

Defendant argues that the wet green socks were not probative of his guilt because there was no evidence to connect them to him or to the burglary. The facts that the socks were not found on the burglarized premises but at a nearby corner house, that they were not

discovered until the morning after the burglary, and that the police witness admitted he did not question the residents of the corner house as to the ownership of the socks, all would have some bearing on the evidentiary weight to be accorded the socks by the jury. We believe, however, that these facts did not deprive this evidence of all probative value nor render it inadmissible. There remained also for the jury's consideration the highly unlikely fact that defendant had performed his duties as chauffeur earlier that evening in full work dress but without socks. With reasonable inferences from the evidence, the jury could have reconstructed the crime as follows: the burglar had explored the Lund home in stocking feet, had left by the back kitchen door when interrupted, had followed the direct route from that point to defendant's car over the wet grass of the back yards of the homes on the south side of Dinsmore Road, had deposited his wet socks in the garbage can at the rear driveway of the corner house and attempted to conceal the socks by putting a newspaper on top of them, had put on his dry shoes which had been left there on the way to the Lund home, and thereafter, walking on dry pavement, had gone the remaining short distance to his car, where he was again interrupted before he could put the jewelry boxes and radio into the car.

**The Gloves**

 Testimony concerning the gloves was given by Officer Jacobs who did not examine the scene of the burglary until 6:00 a. m. the following morning. Jacobs stated that he and Officer Krueger searched the area around the Lund home on foot and discovered a glove on the west side of Rosewood opposite the private driveway at the corner of Rosewood and Dinsmore and near where the Oldsmobile had been parked. This glove was said to match another glove found the night before by

Officer Kretch and Lieutenant Unger when they drove the Oldsmobile to the police station.

Defendant again complains that this item of evidence was not sufficiently connected to him to be probative of his guilt. We think otherwise. One glove was found under defendant's car after it was moved, and the other was found in close proximity thereto. Under the circumstances, we think the gloves were sufficiently associated with defendant to be properly considered by the jury. Furthermore, any error in this regard could not have been sufficiently prejudicial to justify reversal.

**The Tools**

██ ██ Defendant contends that the tools were not probative evidence against him under the charge of burglary because they were not connected to the burglary by any evidence in the record. While it is true that no direct evidence was presented which linked any of the tools found in defendant's possession to the method of entrance employed by the burglar, such proof is not required. All that is required is proof that a burglary was committed and that defendant was found to have burglary tools in his possession shortly thereafter. People v. Urban, 381 Ill 64, 68, 44 NE2d 885; Williams v. People, 196 Ill 173, 63 NE 681.

Mary Lund testified that after she became aware of the burglary, she noticed that the kitchen door of her home was open. The other doors were locked and she did not recall whether or not the kitchen door had been locked prior to the time she started her shower. Considering this and all the other circumstances in evidence, we think the tools had probative value and were thus properly admitted.

As to the tools, it was also appropriate for the jury to consider their nature, and particularly the modification which had been made in one of the tools to convert it into what one of the police officers described as a

"lock puller." Defendant's brother said that he had the alteration performed so he could cut bolts on a barbershop mirror. He also testified that after using it for that purpose, he put it into the Oldsmobile. Defendant's nephew, however, testified that he used it to pull nails from the ceiling and that he then put it into the car. Both these witnesses said the car was Thurman's, while the policeman said that defendant claimed it as his and that defendant's story checked out. Defendant, in his brief, also adopted the police testimony on this score, even though it thus casts strong suspicion on the testimony of defendant's relatives.

### The Stolen Property

■■ Defendant contends that the jewelry boxes and other stolen property did not properly qualify as evidence against him, because they were not found in his possession and were not connected to him. This argument ignores not only all the other circumstances introduced into evidence, as related above, but it also ignores the fact that the stolen property was found stacked under bushes on the route from the Lund home and in close proximity to defendant's car. In such circumstances, we believe that the admission of the stolen property was proper. People v. Bryan, 27 Ill2d 191, 195, 188 NE2d 692; People v. Stanton, 16 Ill2d 459, 469, 158 NE2d 47.

### The Two Kennedy Half Dollars

■■ ■■ These were found in defendant's right rear pocket by Officer Wallace at the time of the arrest. Defendant contends that they should not have been admitted into evidence because at the time of the arrest the police had no idea that Kennedy half dollars had been stolen and because there was no evidence to prove that these were the half dollars stolen from the Lund home. Defendant's first objection is satisfactorily explained by Wallace's testimony in which he stated that

he kept the Kennedy half dollars because he found them in a different pocket from defendant's other change. As to the second objection, defendant is correct that no witness was able positively to identify the Kennedy half dollars found on defendant as being those stolen from the Lund home. However, it has been held that items which are not distinguishable from those stolen but lack readily identifiable features may still be admitted into evidence if found in defendant's possession immediately after commission of the crime. People v. Sellers, 30 Ill2d 221, 224, 196 NE2d 481; People v. Rogers, 16 Ill2d 175, 157 NE2d 28.

While the testimony of defendant's friend Qualls (that he had sold the two half dollars to defendant the night before for $5) may be considered as having tendered a lawful explanation for their possession by defendant, it had no bearing on the admissibility of the coins. It did, however, present to the jury a subsidiary question of credibility, and Qualls' story could properly have been tested by the jury against what defendant would argue was the coincidental circumstance of defendant's being very near to the scene of the burglary, very shortly thereafter, with two coins in his hip pocket (not the same pocket with other change), and the two coins being indistinguishable from the two coins which had just been stolen.

■ ■ While it is true that all the evidence adduced against defendant is circumstantial in character, the weight and effect to be accorded it should be no less than that given to direct evidence. People v. Taylor, 410 Ill 469, 475, 102 NE2d 529; People v. Buskievich, 330 Ill 532, 162 NE 196. We conclude that the totality of the foregoing circumstances establishes defendant's guilt of burglary beyond a reasonable doubt. People v. Hansen, 5 Ill2d 535, 126 NE2d 243; People v. Russell, 17 Ill2d 328, 161 NE2d 309.

(2) As the basis for reversal of his conviction for unlawful possession of burglary tools, defendant contends that there was no evidence to prove the requisite criminal intent to use the tools. The tools found in defendant's possession included a crowbar, a pair of pliers and a pair of cable cutters which was modified to the extent that it could be used to clamp on to "a round, tumbler type lock," twist it and pull it out. Because of this modification, Officer Wallace termed the tool a "lock puller." There is no question that either such an implement or a crowbar may be used to effect a breaking and entering. While there was testimony given by defendant's witnesses that the cable cutters were "ground down" for the purpose of removing bolts in a barber shop, it has been held that the suitability of tools for a breaking renders it immaterial that they were also adapted for a lawful purpose. People v. Taylor, 410 Ill 469, 473–474, 102 NE2d 529.

When confronted by the arresting officer, defendant claimed ownership of the Oldsmobile. While the record is silent as to defendant's reaction at the time the tools were found, it is now suggested that testimony of Thurman and Floyd Johnson to the effect that Thurman was the owner of the car gives rise to an inference that defendant had no knowledge that the tools were in the car. This suggestion does not appear reasonable, however, since Officer Krueger testified that the police checked out defendant's claim of ownership of the car and, as far as they were able to ascertain, defendant's claim of ownership was valid. Furthermore, in at least several places in his brief defendant adopts the testimony of the policeman as to what defendant said concerning ownership of the car and his reason for being at that location. All this is sufficient, we think, to demonstrate that defendant had knowledge that the tools were in his possession.

■■ In the light of the foregoing, if the requisite criminal intent was proved, the conviction on this charge must stand, and there need not be proof of a specific character, a general burglarious intent being sufficient. People v. Taranto, 2 Ill2d 476, 482, 119 NE2d 221. In a case such as this, where there is no confession, the essential element of intent must ordinarily be proved by circumstantial evidence. People v. Faginkrantz, 21 Ill 2d 75, 80, 171 NE2d 5. We shall not repeat the facts which make up the situation in which defendant found himself in this case. The mosaic of incriminating circumstances here is much stronger than in the two principal cases relied on by defendant in regard to possession of burglary tools. People v. Taylor, 410 Ill 469, 102 NE 2d 529; People v. Polenisiak, 26 Ill2d 317, 186 NE2d 271. We conclude that defendant's guilt was adequately established as to the second count of the indictment also.

■ (3) Defendant further contends that the trial court was in error in overruling an objection to testimony of Officer Wallace describing the purpose of narrowing the prongs on the cable cutters found in defendant's possession at the time of his arrest. Defendant argues that Wallace's characterization of the cable cutters in its modified state as a "lock puller" invaded the province of the jury. We do not share defendant's view in this regard. The testimony did not touch upon the ultimate question of intent with which defendant possessed the tool, but dealt instead with the functional aspect of the tool as it appeared when found. Testimony of police witnesses which has even characterized tools found in a defendant's possession as those "commonly used by burglars" has been held properly admitted, and we think it was not improper to accept the milder testimony on this subject in the case at bar. People v. Taylor, 410 Ill 469, 472, 102 NE2d 529.

(4) Defendant argues that reversible prejudice was injected by the prosecutor in his closing argument; that part of the argument was inflammatory and part was based upon matters not in evidence. Because the record shows no objection was raised in the trial court as to any of the State's Attorney's closing argument, we are not obliged to consider error assigned on this ground. People v. Donald, 29 Ill2d 283, 194 NE2d 227; People v. Sinclair, 27 Ill2d 505, 190 NE2d 298. We have reviewed the objections raised, however, and do not consider them of the magnitude of reversible error. Comments about the habit and effect of a burglar did no more than point out the evil results of crime and urge a fearless administration of the law. People v. Burnett, 27 Ill2d 510, 517, 190 NE2d 338; People v. Moore, 9 Ill2d 224, 137 NE2d 246. Another comment raised the question of what might have occurred had Mary Lund stepped out of the shower sooner, and, in addition, suggested to the jury the course of escape of the burglar when he heard the shower turned off. We think both of these remarks were fair comment by the prosecutor based on legitimate inferences from the circumstances proved. People v. Sullivan, 22 Ill2d 122, 174 NE2d 860.

(5) Finally, defendant contends that the court erred in giving the State's instruction No. 6 while at the same time refusing defendant's instruction No. 3. Both instructions were on the subject of circumstantial evidence. The objectionable language in the State's instruction, as set out by defendant, is as follows: "The law demands a conviction wherever there is sufficient legal evidence to show the defendant's guilt beyond a reasonable doubt and circumstantial evidence is legal evidence." This identical language in an instruction has been approved in People v. Graves, 331 Ill 268, 275, 162

285

NE 839. Furthermore, there was no objection raised by defendant in the trial court. People v. Minor, 20 Ill 2d 496, 499, 170 NE2d 555.

On the other hand, the last sentence in defendant's refused instruction No. 3 rendered the entire instruction incorrect, and therefore the instruction was properly refused. In summary, this instruction required the jury to find the defendant not guilty unless the circumstances excluded "to all moral certainty, every other hypothesis but the single one of guilt of the defendant." If this approach were to be followed in an instruction, it is not "every other hypothesis" of defendant's innocence which must be excluded on the basis of the evidence, but every "reasonable hypothesis." People v. Guardino, 13 Ill2d 58, 63, 147 NE2d 338; People v. Dougard, 16 Ill2d 603, 607, 158 NE2d 596. The same type of fault is found in the language, "to all moral certainty." If this clause may be equated to "beyond a reasonable doubt" (and we much prefer the latter), the clause used in defendant's instruction including the word "all" would erroneously imply that, in order to convict, the jury would have to find proof of guilt beyond *all* doubt.

More importantly, we have given consideration to all the instructions given by the trial court and we conclude that the instructions as a whole were fair and correct.

DECISION

While defendant's sentence (10 to 25 years) is a severe one, we cannot say that it is excessive, in view of the fact that defendant has spent most all of the last 25 years in the penitentiary under sentences for four different major crimes including burglary. (See this opinion, above.)

The judgment of the Circuit Court is affirmed.

Affirmed.

DRUCKER and McCORMICK, JJ., concur.